FRIEDMAN, District Judge:
The district court enjoined Plaintiffs-Appellants SFM Holdings, Ltd. and Salo-mon Melgen (collectively “SFM”) from prosecuting an action in Florida state court against Defendant — Appellee Banc of America Securities, LLC (“BAS”). The district court considered the injunction necessary “to protect and effectuate” judgments that were issued in an earlier federal lawsuit brought by SFM against BAS, in which SFM’s claims were dismissed. See SFM Holdings, Ltd. v. Banc of America Sec., LLC, No. 88, 06-cv-80652-KLR (S.D.Fla. Jan. 17, 2013). SFM appeals from the issuance of this injunction, arguing that it does not fall within the narrow “relitigation exception” to the Anti-Injunction Act, 28 U.S.C. § 2283. We agree in large part, holding that SFM’s state court action presents some legal claims that differ from those decided in the prior federal action. With respect to other claims now advanced by SFM, however, we conclude that the district court had authority to enjoin their relitigation in state court.
I. BACKGROUND
This appeal concerns the effect of an earlier federal lawsuit on a pending state lawsuit, both arising from the same course of events between the parties. The facts alleged in each case, however, tell the story somewhat differently; indeed, these factual differences are integral to resolution of this appeal. We draw on the facts as alleged in SFM’s most recent state court complaint, the “2012 State Complaint,” an amended complaint filed in its state case, which was initiated in 2008. References to the complaint from SFM’s earlier federal lawsuit will employ the label “2006 Federal Complaint.”
In September of 2004, Dr. Salomon Mel-gen, a Florida ophthalmologist, invested a total of $15,000,000 in an account at BAS and granted permission to a man named John Kim to trade securities in the account. 2012 State Complaint ¶¶ 1-2, 19. The investment was made through an entity, SFM Holdings, Ltd., controlled solely by Dr. Melgen. He made the decision to put his assets under Kim’s management on the recommendation of a friend, Jerome Fisher, who told Dr. Melgen that Kim had been producing strong returns for him. Id. ¶ 12. To establish SFM’s account at BAS, Dr. Melgen signed two contracts: a Prime Broker Margin Account Agreement (“PBA”) and an Institutional Account Agreement (“LAA”). Id. ¶ 19. Melgen also signed a Trading Authorization form, through which he designated Kim as his agent with authority to trade in the account. Id.
Unbeknownst to Dr. Melgen, Fisher was in financial trouble and, more specifically, it is alleged that this trouble was attribut *1332 able to John Kim, who was not the expert securities trader that Fisher had made him out to be. Id. ¶ 15. In fact, Fisher’s account at BAS was incurring large losses on margin, due to the poor stewardship of Kim and his business partner, Won Lee. Because of the losses that Kim and Lee— through an entity called Shoreland Trading — were causing in Fisher’s account, BAS had notified Lee that an infusion of new assets was needed to cover the margin calls. Id. ¶ 87. Fortunately for Kim, Lee, and Fisher, they found a source of fresh money to plug this gap: SFM.
Over a week-long period in late September and early October of 2004, SFM funded its BAS account with $12.3 million. Id. ¶ 22. Shortly thereafter, Dr. Melgen learned that his account had suffered some losses, and he informed Kim that he planned on closing the account. Id. ¶¶ 29, 33. Fisher and Kim then met with Melgen and persuaded him to keep the account open; as part of the inducement, Kim provided Melgen with a written guaranty of his principal. Id. ¶¶ 33-34. Kim also transferred an additional $2.7 million into SFM’s account, money which belonged to Dr. Melgen and was being held by Kim as part of a separate investment. See id. ¶ 22; Appellants’ Brief at 4.
Just a few months later, in February 2005, Dr. Melgen learned that the entire $15 million held in the SFM account at BAS was gone. 2012 State Complaint ¶ 57. The story of what happened to Mel-gen’s money will be discussed in further detail later in this opinion, as these facts pertain directly to whether SFM can permissibly be enjoined from litigating its action in state court. For now, however, we present a snapshot of the basic allegations set out in the 2012 State Complaint. SFM first alleges that a substantial portion of its assets, roughly $9 million, was converted to Fisher’s benefit by Won Lee, who allocated SFM’s assets to cover margin calls in Fisher’s account, as well as by Lee’s allocation of trading gains to Fisher and trading losses to SFM. Id. ¶¶ 26-27, 76, 82. Moreover, SFM alleges that Lee was not even authorized to trade in its account, yet BAS permitted him to do so. Id. ¶¶ 24-25. Second, SFM alleges that the remainder of its funds was transferred out of its account and into a separate Shoreland Trading account at BAS, from which Lee eventually stole SFM’s assets. Id. ¶¶ 41, 45. The transfer was executed by BAS, which relied on directions contained in a letter transmitted to it by facsimile; the letter purported to be written and signed by Dr. Melgen, but in fact was a forgery produced and sent by Won Lee. Id. ¶¶ 41-42,131(c).
In March 2005, shortly after Melgen learned of the loss of his assets, SFM filed an action in Florida state court against Kim, Lee, Shoreland Trading, and the KL Group, another entity controlled by John Kim and Won Lee. Appellants’ Brief at 5. At that time, no wrongdoing was alleged against BAS, but SFM sought discovery from BAS requesting the production of records relating to all accounts controlled by Shoreland. The parties bitterly dispute the subsequent course of events; SFM contends that BAS wrongfully refused to produce relevant documents, and that BAS was even sanctioned by the state court for its recalcitrance. Id. at 5-7. BAS maintains that it complied with all court orders, and, to the extent that it did not produce documents sought by SFM, it argues that its behavior was compelled by Florida law protecting its clients’ privacy. Appellee’s Brief at 14. In any event, SFM’s state lawsuit was eventually dismissed pursuant to a receivership order entered by the federal district court, emanating from an action brought by the Securities and Exchange Commission against the KL Group. Appellants’ Brief at 7 n. 5.
*1333 In June 2006, SFM filed a lawsuit against BAS in federal court. In its complaint — the 2006 Federal Complaint— SFM brought four claims: two for violations of federal and Florida securities law, as well as tort claims for breach of fiduciary duty and constructive fraud. The case was assigned to the same district court judge who was overseeing the receivership, and he ultimately dismissed SFM’s complaint with prejudice. SFM Holdings, Ltd. v. Banc of America Sec., LLC, No. 06-cv-80652-KLR, 2007 WL 7124464 (S.D.Fla. Feb. 12, 2007). In its decision, the district court concluded that SFM had failed to state claims under either federal or state securities law, and it denied SFM leave to replead those claims. Id. at *7. The court also held that SFM’s claims for breach of fiduciary duty and constructive fraud were deficient, stating that “[cjentral to both claims is the allegation that Banc of America was acting as SFM’s fiduciary,” but concluding that this requirement could not be satisfied, “[g]iven the plain language in the Prime Brokerage Agreement.” Id. The court said it had examined that agreement, which contained a clause that “state[d] unequivocally that Banc of America was not ‘acting as a fiduciary,’ and was not ‘advising [SFM], performing any analysis, or ... offer[ing] any opinion, judgment or other type of information pertaining to the nature, value, potential or suitability of any particular investment].’ ” Id. (quoting the PBA) (some alterations in original).
The court added that “[t]he tort claims are also barred by the application of the economic loss rule, which provides that parties to a contract can only seek tort damages if the alleged tortious conduct constitutes a tort distinct from the parties’ contractual rights and obligations.” Id. at *8. Finally, the court held that “[Replead-ing will not enable SFM to surmount the hurdles of the economic loss rale or the language of the Prime Broker Agreement.” Id. It therefore dismissed the complaint with prejudice. Id.
SFM appealed the dismissal of the constructive fraud and breach of fiduciary duty claims, but this court affirmed. See SFM Holdings, Ltd. v. Banc of America Sec., LLC, 600 F.3d 1384, reh’g en banc denied, 402 Fed.Appx. 513 (11th Cir.2010). In reaching our decision, we examined not only the PBA, but also the IAA, and concluded that these two contractual agreements foreclosed SFM’s tort claims. Id. at 1339-40. We did not consider the district court’s alternative holding' that Florida’s economic loss rule operated to bar these claims. See id. But our ruling did address SFM’s argument — made only in its appellate briefing — that it should be granted leave to amend its complaint by adding a claim for breach of contract, on the ground that the factual allegations already in its complaint could support such a claim. Id. at 1340. In the final paragraph of our decision, we denied such leave by concluding that “Banc of America Securities’s compliance with its obligations under [the PBA and IAA] precludes liability for breach of contract. Therefore, the suggested amendment would be futile.” Id.
Prior to oral argument before this court in that appeal, however, SFM had already filed a new lawsuit in state court. Its complaint there included claims for breach of contract with respect to both the PBA and the IAA, as well as for breach of the implied covenant of good faith and fair dealing in these agreements. Appellants’ Brief at 10-11. SFM also named Jerome Fisher — the friend who had drawn Dr. Melgen into this mess — as a defendant in that action.' BAS thereupon removed the case to federal court on the ground that Fisher had been fraudulently joined in order to destroy diversity; the federal district court accepted that argument. Id. at *1334 11. Eventually, the district court dismissed the removed action on res judicata grounds. Id. SFM appealed, and this court, in a per curiam decision, held that removal had been improper and the district court therefore lacked subject matter jurisdiction over the case. SFM Holdings, Ltd. v. Fisher, 465 Fed.Appx. 820, 821-22 (11th Cir.2012). We vacated the district court’s dismissal of the action and ordered that it be remanded to state court. Id. at 822. After the remand to state court, SFM amended its complaint to add a claim alleging civil conspiracy between BAS, Fisher, Kim, Lee, and Shoreland Trading. This complaint, the “2012 State Complaint,” is now the operative complaint in the state action. Appellants’ Brief at 15.
Finally, we arrive at the federal decision that is the source of this appeal. After SFM’s case was remanded to state court and SFM had filed its amended complaint there, BAS went back to federal court to seek an injunction against SFM’s pursuit of the state action against it. BAS argued that the district court’s 2007 judgment dismissing SFM’s original federal case with prejudice, along with our 2010 affirmance of that dismissal — which included the denial of leave to add a claim for breach of contract — together deserved insulation from a potentially inconsistent state court judgment. The district court agreed and granted the injunction. See SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR (S.D.Fla. Jan. 17, 2013). SFM now appeals, arguing that the federal injunction was inconsistent with this court’s mandate that the lawsuit be remanded to the Florida court, and that the injunction was impermissible under the Anti-Injunction Act, 28 U.S.C. § 2283, which generally forbids federal courts from enjoining proceedings in state court.[1]
II. JURISDICTION AND STANDARD OF REVIEW
We have jurisdiction pursuant to 28 U.S.C. § 1291, as the district court’s injunction was permanent rather than interlocutory. ‘Whether a district court has the authority to enjoin a state court action under an exception to the Anti-Injunction Act is a question of law that we review de novo.” Estate of Brennan ex rel. Britton v. Church of Scientology Flag Serv. Org., Inc., 645 F.3d 1267, 1272 (11th Cir.2011). “If the court had such authority, whether the [i]njunction should have issued presents a mixed question of law and fact, which we review for abuse of discretion.” Burr & Forman v. Blair, 470 F.3d 1019, 1030 n. 31 (11th Cir.2006).
III. DISCUSSION
A. All Writs Act and the Relitigation Exception to the Anti-Injunction Act
The All Writs Act provides that federal courts “may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.” 28 U.S.C. § 1651(a). The statute codifies “the long recognized power of courts of equity to effectuate their decrees by injunctions or writs of assistance.” Burr & Forman, 470 F.3d at 1026 (quoting Wesch v. Folsom, 6 F.3d 1465, 1470 (11th Cir.1993)) (alteration and quotation marks omitted). Although its express language refers only to writs issued “in aid of [courts’] jurisdictions,” it is understood that the All Writs Act “also *1335 empowers federal courts to issue injunctions to protect or effectuate their judgments.” Id. (quoting Wesch, 6 F.3d at 1470).
The Anti-Injunction Act, however, “serves as a check on the broad authority recognized by the All Writs Act.” Id. at 1027. The Anti-Injunction Act provides:
A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.
28 U.S.C. § 2283.
The Anti-Injunction Act’s “core message is one of respect for state courts,” and it “broadly commands that those tribunals ‘shall remain free from interference by federal courts.’ ” Smith v. Bayer Corp., — U.S. -, 131 S.Ct. 2368, 2375, 180 L.Ed.2d 341 (2011) (quoting Atlantic Coast Line R. Co. v. Locomotive Engineers, 398 U.S. 281, 282, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970)). The statute allows three exceptions to this general prohibition, but “those exceptions, though designed for important purposes, ‘are narrow and are not [to] be enlarged by loose statutory construction.’ ” Id. (quoting Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 146, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988)) (internal quotation marks omitted) (alteration in original). The Supreme Court has long emphasized that “[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed.” Id. (quoting Atlantic Coast Line, 398 U.S. at 297, 90 S.Ct. 1739).
The third of the Anti-Injunction Act’s exceptions provides that a federal court may issue an injunction “to protect or effectuate its judgments.” 28 U.S.C. § 2283. This provision “is designed to implement ‘well-recognized concepts’ of claim and issue preclusion,” and is commonly labeled the “relitigation exception.” Smith, 131 S.Ct. at 2375 (quoting Chick Kam Choo, 486 U.S. at 147, 108 S.Ct. 1684). The exception “authorizes an injunction to prevent state litigation of a claim or issue ‘that previously was presented to and decided by the federal court.’ ” Id. (quoting Chick Kam Choo, 486 U.S. at 147, 108 S.Ct. 1684). But because preclusion decisions are “usually the bailiwick of the second court ... every benefit of the doubt goes toward the state court [and] an injunction can issue only if preclusion is clear beyond peradventure.” Id. (citing Atlantic Coast Line, 398 U.S. at 287, 90 S.Ct. 1739).
In Smith, the Supreme Court’s most recent decision explicating the relitigation exception, the Court invalidated a district court’s injunction “for two reasons.” Id. at 2373. First, the state court action involved a legal issue that “was not identical to the one decided in the federal tribunal.” Id. Second, the plaintiff in the state action had not been a party to the federal lawsuit in which the prior judgment was issued, nor did he fall within one of the “handful of discrete and limited exceptions” under which nonparty preclusion is permissible. Id. at 2379. Consequently, the Court held that the district court, in issuing its injunction, had “exceeded its authority” under the relitigation exception. Id. at 2373.
In this case, our inquiry is limited to the first of the two grounds on which the Court relied in Smith, namely whether SFM’s state action presents the same claims or issues that were previously decided in SFM’s federal lawsuit.[2] If so, *1336 then the district court possessed authority to enjoin their relitigation. If not, then it lacked such authority and an injunction should not have issued. In conducting this inquiry, we are mindful that the relitigation exception “permits a federal court to enjoin a state proceeding only in rare cases,” id. at 2373, and that, under this provision, “close cases have easy answers: The federal court should not issue an injunction, and the state court should decide the preclusion question.” Id. at 2382.
The parties seem to disagree about the breadth of the relitigation exception. Appellant SFM argues that it is exceedingly narrow: for an injunction to issue, the claim or issue sought to be litigated in state court must previously have been actually litigated and decided in federal court. Appellants’ Brief at 25-29. Appellee BAS argues, at least at certain points in its brief, for a broader view — that an injunction may issue to prevent the litigation of claims that either were actually litigated and decided or those that “could have been” litigated, but were not. Appellee’s Brief at 40-42. This broader view is consistent with traditional principles of claim preclusion (although not issue preclusion), see Taylor v. Sturgell, 553 U.S. 880, 892, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008), but not with the relitigation exception to the Anti-Injunction Act. Whether the principles of claim preclusion may “inform” one’s view of the relitigation exception, see Smith, 131 S.Ct. at 2376 n. 7, the relitigation exception is narrower and only authorizes an injunction “to prevent state litigation of a claim or issue ‘that previously was presented to and decided by the federal court.’ ” Id. at 2375 (quoting Chick Kam Choo, 486 U.S. at 147, 108 S.Ct. 1684); see Chick Kam Choo, 486 U.S. at 148, 108 S.Ct. 1684 (“[A]n essential prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court.”). Indeed, as the district court noted in this case, “unlike pure res judicata, the relitigation exception should only be invoked to preclude subsequent litigation of matters that actually were decided by the federal court.” SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR, at 11 (S.D.Fla. Jan. 17, 2013). This is the basis on which we shall proceed.
B. Semtek and Principles of Preclusion Law
The Supreme Court in Smith and Chick Kam Choo, therefore, has set forth a unique legal standard to determine the permissibility of enjoining state court proceedings under the relitigation exception. Nevertheless, the parties expend a fair amount of effort debating whether our inquiry in this case should be governed by federal or, alternatively, Florida rules of preclusion. Compare Appellants’ Brief at 37-46 (arguing for Florida law), with Appellee’s Brief at 42-46 (arguing for federal law). Their dispute revolves around differing interpretations of the Supreme Court’s decision in Semtek Int’l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001), which addressed the preclusive effect of federal diversity judgments. Under Semtek, federal common law generally incorporates state law to determine the preclusive effect of a federal diversity judgment. See id.[3] *1337 “This federal reference to state law will not obtain,” however, “in situations in which the state law is incompatible with federal interests.” Id. at 509, 121 S.Ct. 1021.
We conclude, as did the Supreme Court in Smith, that the case before us does not demand resolution of these concerns. See 131 S.Ct. at 2376 n. 6 (“Neither party identifies any way in which federal and state principles of preclusion law differ in any relevant respect. Nor have we found any such divergence.”). A comparison between Florida rules and federal rules governing claim and issue preclusion reveals that the relevant principles are largely identical. Compare State v. McBride, 848 So.2d 287, 290 (Fla.2003) (claim preclusion), and id. at 290-91 (issue preclusion), with Lobo v. Celebñty Cruises, Inc., 704 F.3d 882, 892 (11th Cir.2013) (claim preclusion), and CSX Transp., Inc. v. Bhd. of Maint. of Way Emps., 327 F.3d 1309, 1317 (11th Cir.2003) (issue preclusion). Moreover, we may draw on the Supreme Court’s own precedents under the relitigation exception for more specifically apposite guidance.
The one purported substantive difference between Florida and federal law that is highlighted by the parties is the existence, under Florida law, of equitable exceptions that militate against preclusion where the “ends of justice” or “manifest injustice” so require. See Appellants’ Brief at 41-46 (citing, inter alia, Universal Constr. Co. v. City of Fort Lauderdale, 68 So.2d 366, 369 (Fla.1953) (en banc)).[4] SFM argues that these principles come into play because BAS thwarted SFM’s earlier attempts to obtain evidence pertinent to the parties’ relationship and demonstrative of BAS’s wrongdoing. Consequently, SFM contends, its 2006 Federal Complaint was drafted without the benefit of complete information, a defect from which BAS should not now be able to profit. We need not sort through a history of discovery that remains bitterly disputed between the parties. Under the narrow view of the relitigation exception— which asks whether the claims or issues presented to the state court are the same as those that were actually litigated and decided by a federal court — if there are indeed material differences between the factual allegations presented by the 2006 Federal Complaint and the 2012 State Complaint, the cases present non-identical questions of law that render a federal injunction impermissible. The parties’ ongoing disputes over what happened in discovery do not affect our narrow inquiry under the relitigation exception to the Anti-Injunction Act.
C. SFM’s Conspiracy Claim
In its 2012 State Complaint, SFM alleges that BAS engaged in a conspiracy with Fisher, Kim, Lee, and Shoreland Trading “to mislead Dr. Melgen, and conceal the truth from him concerning the fraud and conversion of SFM funds.” 2012 State Complaint ¶ 85. The 2006 Federal Complaint did not allege the tort of conspiracy. Thus, SFM argues, the prior federal judgments could not have decided this claim, and therefore SFM cannot be enjoined *1338 from prosecuting its conspiracy claim in state court. Appellants’ Brief at 34.
1. Economic Loss Rule No Bar
BAS contends that “SFM’s conspiracy tort claim in its 2012 State Complaint is no different than the torts the District Court dismissed in the 2006 Federal Action,” Appellee’s Brief at 48, and highlights the district court’s holding that Florida’s economic loss rule foreclosed the viability of any tort claims arising out of the contractual relationship between the parties. See id. at 51-52. Indeed, this is the ground upon which the district court primarily relied in its injunction order. See SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR, at 13-15 (S.D.Fla. Jan. 17, 2013). The economic loss rule, as the district court described it in its 2007 ruling, “provides that parties to a contract can only seek tort damages if the alleged tor-tious conduct constitutes a tort distinct from the parties’ contractual rights and obligations,” and the court determined that SFM’s tort claims were barred by that rule. SFM Holdings, Ltd., 2007 WL 7124464, at *8. In its injunction order, the district court concluded that “SFM’s conspiracy claim in the 2012 State Complaint is no different than the torts that this Court dismissed in the 2006 Federal Action,” and that SFM’s conspiracy claim therefore “is barred by this Court’s economic loss rule holding.” SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR, at 13-14 (S.D.Fla. Jan. 17, 2013).
In response, SFM argues that a recent decision of the Supreme Court of Florida — which limited application of the economic loss rule to products liability cases — constitutes an intervening change in law that renders preclusion on this ground impermissible. Appellants’ Brief at 34-35 (discussing Tiara Condo. Ass’n, Inc. v. Marsh & McLennan Cos., Inc., 110 So.3d 399 (Fla.2013)). BAS replies that changes in the law thwart preclusion only where there have been “momentous changes in important, fundamental constitutional rights,” a situation that it contends has not obtained here. Appellee’s Brief at 52 (quoting Precision Air Parts, Inc. v. Avco Corp., 736 F.2d 1499, 1504 (11th Cir.1984)).
This court, in its 2010 opinion affirming the dismissal of SFM’s complaint, did not address the district court’s economic loss rule rationale. Instead, exercising de novo review of the dismissal order, we concluded that SFM failed to state claims for breach of fiduciary duty or constructive fraud. Our 2010 ruling was based on a close examination of the two contracts executed between SFM and BAS, which revealed that SFM’s tort claims rested on purported duties that BAS did not owe to it. See SFM Holdings, Ltd., 600 F.3d at 1338-40. Accordingly, the district court’s alternative rationale based on the economic loss rule is not a judgment in need of “protection or effectuation” under the re-litigation exception. See Restatement (Second) of Judgments § 27 cmt. o (1982) (“If the judgment of the court of first instance was based on a determination of two issues, either of which standing independently would be sufficient to support the result ... [and] the appellate court upholds one of these determinations as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, the judgment is conclusive as to the first determination.”). We therefore put the economic loss rule issue aside and return to the core inquiry: whether SFM’s 2012 state conspiracy claim presents a legal claim or issue that has already been decided by a federal court.
2. Comparison of 2006 Tort Claims and 2012 Conspiracy Claim
Although it is plain that no conspiracy claim was alleged in the 2006 *1339 Federal Complaint, “an actionable conspiracy requires an actionable underlying tort or wrong.” Raimi v. Furlong, 702 So.2d 1273, 1284 (Fla.Dist.Ct.App.1997). This is to say that conspiracy is not a freestanding tort, but, rather, “a cause of action for civil conspiracy exists ... only if ‘the basis for the conspiracy is an independent wrong or tort which would constitute a cause of action if the wrong were done by one person.’ ” Id. (quoting Blatt v. Green, Rose, Kahn & Piotrkoivski, 456 So.2d 949, 951 (Fla.Dist.Ct.App.1984)). The question before the court is whether SFM now alleges that BAS engaged in a conspiracy to commit the same torts as were previously alleged in its 2006 Federal Complaint, or, instead, a different tort or torts. This question implicates the conduct of BAS as well as that of its alleged co-conspirators, and the nature of the role now alleged to have been played by BAS in causing SFM’s damages. Its resolution requires examination of SFM’s allegations in both its 2006 and 2012 complaints. We therefore turn now to a close study of these pleadings.
In its 2006 federal lawsuit, SFM brought claims against BAS for breach of fiduciary duty and constructive fraud. Under Florida law, these torts rest on the same foundation, as “[a] constructive fraud is deemed to exist where a duty under a confidential or fiduciary relationship has been abused.” Rogers v. Mitzi, 584 So.2d 1092, 1094 (Fla.Dist.Ct.App.1991) (citing, inter alia, Douglas v. Ogle, 80 Fla. 42, 85 So. 243 (1920)). SFM’s tort claims rested on a threefold theory of wrongdoing. First, SFM alleged that BAS allowed Won Lee to control the SFM account and to include SFM’s assets in an omnibus account held by Shoreland Trading, without Dr. Melgen’s authorization. 2006 Federal Complaint ¶1¶25, 39, 40, 46, 51(A), 51(B). SFM further alleged that BAS knew that Lee was an untrustworthy person who had executed at least two illegal trades in SFM’s account, which prompted BAS to order Lee to move his trading operations to another financial institution. Id. ¶¶ 41-45, 47, 51(A), 51(D), 51(G), 51(1). Second, SFM maintained that BAS failed to inform Dr. Melgen of Lee’s unauthorized and suspicious activities in the SFM account. Id. ¶¶ 51-56, 74-75, 77, 80-81. Third, SFM alleged that BAS acted recklessly in relying on a letter, purporting to be written and signed by Dr. Melgen, instructing BAS to transfer SFM’s remaining assets into a separate account at BAS — controlled solely by Shoreland Trading — from which Lee later took them. In fact, the letter was a forgery produced by Lee. Id. ¶¶ 26-27, 48, 50, 55, 76, 78.
These three basic allegations — BAS’s allowing Lee to control SFM’s account, BAS’s failure to disclose to Melgen crucial information about Lee’s activities in the account, and BAS’s transfer of SFM’s assets in reliance on the forged letter— formed the bases for SFM’s breach of fiduciary duty claim in its 2006 federal lawsuit. Id. ¶¶ 51-56, ¶¶ 75-78. SFM’s constructive fraud claim rested on the second of these allegations, namely that BAS “eonceal[ed] information” that it should have disclosed to Melgen, and that this concealment proximately caused SFM’s damages. Id. ¶¶ 80-81. Those damages, according to the 2006 Federal Complaint, resulted entirely — or almost entirely— from the forged-letter transfer. See id. ¶ 27 (stating that $15 million, the entirety of Melgen’s investment at BAS, was transferred in reliance on Lee’s forged letter). SFM did express some uncertainty in this regard, however, as elsewhere in its 2006 Federal Complaint it alluded to other losses that were incurred prior to the transfer as a result of “risky and speculative” trading, and “trades effected by unauthorized persons.” Id. ¶¶ 38, 60, 77.
*1340 SFM’s 2012 State Complaint contains a new narrative, wholly absent from its 2006 Federal Complaint, regarding how it suffered damages. Specifically, SFM’s new complaint alleges that Lee converted — that is, intentionally took — -a substantial portion of SFM’s assets before the transfer by BAS occurred, by allocating funds from SFM’s account to cover outstanding margin calls in Jerome Fisher’s account, as well as by allocating trading losses to SFM and trading gains to Fisher. See 2012 State Complaint ¶¶ 26-27, 37, 79-80, 86-96; see also Appellants’ Brief at 27-28. By this mechanism of allocation, SFM contends in its 2012 State Complaint that roughly $9 million of its investment at BAS was converted to Fisher’s benefit. 2012 State Complaint ¶¶ 76, 82.[5] In its 2006 Federal Complaint, by contrast, SFM did not allege that its money was intentionally taken from it in this manner. Instead, as already noted, the complaint seemed to allege an imprecise mix of losses, or perhaps alternative theories, based partially on “risky” trading and predominantly on the eventual transfer executed by BAS at Lee’s direction. See 2006 Federal Complaint ¶¶ 27-30, 38, 49, 51(F). Thus, with respect to the $9 million that SFM now alleges was converted to Fisher’s benefit by means of Lee’s intentional allocation decisions, the two complaints describe different scenarios as to how a substantial portion of Dr. Melgen’s money was taken from him.[6] While BAS argues that “SFM’s damages claims in both actions relate to the loss of its entire investment because of BAS’s alleged mismanagement and concealment,” Appellee’s Brief at 31-32, this statement elides the difference in SFM’s new narrative concerning precisely how those losses were caused.
SFM’s 2012 State Complaint for the first time includes allegations drawing a connection between BAS’s conduct — now described as affirmative, intentional conduct — and the allocation scheme by which $9 million of SFM’s money was converted to Fisher’s benefit. The character of this connection, according to SFM, rested both on BAS’s facilitation of these acts of conversion, as well as on its concealment from Dr. Melgen that his money was being misappropriated by Lee to benefit Fisher. Count III of SFM’s 2012 State Complaint, the conspiracy claim, therefore includes factual allegations aimed at supporting conspiracies both to commit conversion and to conceal this conversion from Dr. Melgen.
As to BAS’s alleged participation in the conspiracy to convert, SFM contends that BAS did so by permitting allocations to occur with the knowledge that SFM’s funds were being wrongfully siphoned from it, as well as, in some instances, by actively facilitating the execution of these allocations. To support this theory, SFM puts forth an amalgam of factual allegations that includes new facts — not alleged in its 2006 Federal Complaint — as well as *1341 some facts that did appear in its earlier complaint. Paragraphs 85 through 108 of the 2012 State Complaint set forth the bulk of the new allegations. SFM alleges, for example, that on the day prior to its deposit of $10 million at BAS, a BAS account executive named Brett Speer sent an e-mail to Won Lee asking how Lee planned to cover a margin call in Fisher’s account amounting to more than $5 million. 2012 State Complaint ¶¶ 15, 86-87. According to SFM, “Lee responded that he had a new client who would be bringing $10,000,000 to BAS.” Id. ¶ 88. The following day, Speer communicated with another BAS official and acknowledged receipt of SFM’s funds, and discussed these funds as belonging to the Shoreland Trading omnibus account. Id. ¶ 89.
The complaint goes on to describe further interactions between BAS’s Speer and Lee that, according to SFM, demonstrate that BAS knew Lee was intentionally allocating losses to SFM’s account and profits to Fisher’s account. Id. ¶¶ 90-96. SFM cites, for example, a subsequent e-mail exchange between Lee and Speer in which Lee directs Speer to allocate certain trades to SFM’s account. Id. ¶ 90. Additional e-mails are cited as demonstrating Speer’s concern over the margin calls in both the SFM and Fisher accounts. Id. ¶¶ 91-93. Drawing on these communications, SFM alleges that BAS had specific knowledge of Lee’s attempts to disproportionately allocate funds between the two accounts. Id. ¶¶ 90, 95-96. Furthermore, SFM alleges that “in some cases BAS personnel assisted in making the allocations.” Id. ¶ 96. SFM also asserts that BAS had a financial motive to actively assist in Lee’s conversion of SFM’s funds, as BAS presumably did not want to be left responsible for losses sustained on margin in Fisher’s account. See id. ¶¶ 92, 96.
In addition to BAS’s alleged complicity in a conspiracy to convert SFM’s assets, SFM further alleges that BAS conspired “to mislead Dr. Melgen, and conceal the truth from him concerning the fraud and conversion of SFM funds.” Id. ¶ 85. SFM supports this assertion by alleging, for example, that “BAS and Fisher knew that Kim, Lee, and Shoreland were frauds, but worked together with them and with each other to conceal that information so they could protect and advance their own interests.” Id. More specifically, SFM alleges that “BAS actively concealed from SFM the transactions in the Shoreland Trading omnibus account, as well as the fact that profits had been allocated to Fisher.” Id. ¶ 97.[7] SFM further contends that “both BAS and Fisher concealed Fisher’s role in the scheme that caused Plaintiffs losses,” id. ¶ 66, and that “BAS maintained secrecy concerning the wrongful actions of Kim, Lee, Shoreland Trading, and [itself] even after Dr. Melgen learned that he had lost his assets.” Id. ¶ 97.
The new factual allegations appearing in SFM’s 2012 State Complaint provide support for two tort claims against BAS— conspiracy to convert, and conspiracy to *1342 conceal — that are different in nature than its previously alleged fiduciary-duty based claims. The key difference underlying both claims is that SFM now alleges that intentional acts of conversion were ongoing in its account — prior to the eventual transfer based on the forged letter — as to which BAS had knowledge, with which BAS assisted, and which BAS concealed from Dr. Melgen. Because these precise factual allegations have never been placed before any federal court, the state court now faces tort claims that are “not identical to the one[s] decided in the federal tribunal.” See Smith, 131 S.Ct. at 2373. Consequently, the district court lacked authority to enjoin SFM’s prosecution of Count III of its 2012 State Complaint.[8]
Both the district court and BAS have noted that SFM’s 2006 complaint did contain allegations related to the inclusion of its assets in a Shoreland Trading omnibus account, through which Lee “was able to allocate trades among various accounts controlled by it.” 2006 Federal Complaint ¶ 39. The district court, in its injunction order, noted that one basis for SFM’s original tort claims was Lee’s alleged “commingling [of] SFM’s funds with other accounts [and] allocating [of] trades between accounts.” SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR, at 13 (S.D.Fla. Jan. 17, 2013). And BAS argues that, “[i]n both actions, SFM alleged that BAS permitted Lee to commingle assets, bulk trade through Shoreland’s account, and allocate trades between accounts. SFM added only detail to these allegations in the 2012 State Complaint.” Appellee’s Brief at 28; see also id. at 26-29, 49-50. Our dissenting colleague agrees. See Partial Dissent at 1347-49,1349-51.
But in the 2006 Federal Complaint, SFM was not able to connect these allegations to a theory of harm resulting from Lee’s intentional allocation of SFM’s money to cover Fisher’s margin calls and to absorb losing trades, or to BAS’s active role in facilitating and concealing these alleged acts of conversion. The sole paragraph in the 2006 Federal Complaint referring to the inclusion of SFM’s funds in an omnibus account identifies these facts merely as an example of BAS’s negligently allowing unauthorized activity to occur in SFM’s account, activity that BAS then failed to communicate to Dr. Melgen. See 2006 Federal Complaint ¶ 39. In our view, our dissenting colleague reads far too much into paragraph 39 of the 2006 Federal Complaint, which he regards as alleging that Lee was “misallocating gains and losses of customers, including SFM and Fisher.” Partial Dissent at 1348; see also id. at 1350 (reading paragraph 39 as including allegations that BAS “failed to inform SFM that Lee was misallocating SFM’s funds”). But paragraph 39 simply does not state that Lee intentionally “misallo-cated” SFM’s funds through the omnibus account as a means of benefiting Fisher; nor does any other paragraph appearing in the 2006 Federal Complaint.
In addition, although SFM’s 2006 Federal Complaint advanced tort claims of BAS’s alleged breach of fiduciary duty and constructive fraud based on its failure to inform SFM — or, as SFM sometimes characterized it, BAS’s concealment from SFM — of various matters, these earlier claims cannot justify enjoining SFM’s pur *1343 suit of its claim that BAS conspired to conceal the conversion of SFM’s assets. The two complaints accuse BAS of concealing different things. In 2006, SFM alleged that BAS concealed the fact that it had allowed Won Lee to control SFM’s account, as well as that Lee had engaged in illegal short trades and that BAS had responded by directing Lee to leave Banc of America. See 2006 Federal Complaint ¶¶ 51, 75, 80-81. By contrast, paragraph 85 of the 2012 State Complaint expressly asserts that BAS concealed acts of conversion. Our dissenting colleague believes that “the allegation about misallocations in the omnibus account of paragraph 39 of the 2006 complaint bars SFM from relit-igating these more detailed claims about the concealment of misallocations as a result of the margin calls in the 2012 complaint.” Partial Dissent at 1351. But we reiterate that neither in paragraph 39 nor in any other part of the 2006 Federal Complaint did SFM include allegations concerning misallocations, or, as SFM also characterizes them, “disproportionate[ ]” allocations, see 2012 State Complaint ¶ 26, made by Lee to benefit Fisher at SFM’s expense.
It is also true, as BAS points out, that several other factual allegations concerning BAS’s conduct appear to be virtually identical in both complaints. See Appel-lee’s Brief at 29-31. But this does not alter the conclusion that SFM has now brought different tort claims, based on new theories of liability alleging for the first time BAS’s knowing and active participation in a scheme to allocate SFM’s funds to cover Fisher’s losses, as well as BAS’s concealment of that scheme. That having been said, this court need not grapple with BAS’s argument that SFM could have, or should have, advanced this claim of conspiracy in the original federal lawsuit. See id. at 26-29. BAS will be free to make this argument to the state court in support of any eventual preclusion defense it raises. We face a simpler inquiry: has a federal court actually ruled on the identical legal questions posed by SFM’s conspiracy claim, as that claim is founded on the allegations in the 2012 State Complaint? For the reasons described above, we answer no, and therefore conclude that the high bar of identity required by the re-litigation exception has not been met. Consequently, the district court lacked authority to enjoin SFM’s prosecution of its conspiracy claim in state court.
D. SFM’s Contract Claims
In addition to its conspiracy claim, SFM also brings four contract-based claims in its 2012 State Complaint. With respect to each of the two contracts executed between SFM and BAS — the Prime Broker Margin Account Agreement (PBA) and the Institutional Account Agreement (IAA)— SFM alleges both breach of contract and breach of the implied covenant of good faith and fair dealing. 2012 State Complaint ¶¶ 117-38. This court, in its 2010 decision, held that the factual allegations contained in the 2006 Federal Complaint were insufficient to support claims for breach of either contract, and accordingly we denied SFM leave to amend its complaint to add them. SFM Holdings, Ltd., 600 F.3d at 1340. In its injunction order, the district court therefore concluded that “[t]he only way SFM could proceed with its contract-based claims in state court is if those claims are based on different allegations than those previously presented to the Eleventh Circuit.” SFM Holdings, Ltd., No. 88, 06-cv-80652-KLR, at 15 (S.D.Fla. Jan. 17, 2013). The district court found, however, that the basic allegations in both actions were the same, and therefore our 2010 ruling precluded SFM’s pursuit of contract claims in state court. Id. at 15-17.
*1344 1. Our 2010 Futility Ruling
Before delving into our own analysis, we must address a preliminary issue, namely SFM’s argument that because it never previously had the opportunity to litigate its contract claims in the district court, this court’s 2010 ruling, which held that it would have been futile to grant SFM leave to amend its complaint to add them, cannot now preclude its litigation of these claims in state court. Appellants’ Brief at 29-34. SFM never sought leave to amend while the case was before the district court, but instead noted in its briefing before this court that, “[a]t the very least, the factual allegations of SFM’s complaint will support an action against [BAS] for breach of contract,” and therefore asked that, “at minimum, the dismissal with prejudice should be reversed, and the cause remanded with directions to grant SFM leave to amend its complaint.” Brief of Appellant at 28, SFM Holdings, Ltd., 600 F.3d 1334 (No. 07-11178). We concluded, however, that SFM’s proposed amendment would be futile because “Banc of America Securities acted pursuant to the IA Agreement and the PB Agreement,” and thus “Banc of America Securities’s compliance with its obligations under those documents precludes liability for breach of contract.” SFM Holdings, Ltd., 600 F.3d at 1340.
A court’s determination that a proposed amendment to a complaint would be futile operates as a judgment on the merits of the proposed claim. This conclusion follows from the fact that “[w]hen a ... court denies the plaintiff leave to amend a complaint due to futility, the court is making the legal conclusion that the complaint, as amended, would necessarily fail.” St. Charles Foods, Inc. v. America’s Favorite Chicken Co., 198 F.3d 816, 822 (11th Cir.1999); see also Burger King Corp. v. Weaver, 169 F.3d 1310, 1320 (11th Cir.1999) (“This court has found that denial of leave to amend is justified by futility when the ‘complaint as amended is still subject to dismissal.’ ” (quoting Halliburton & Assocs., Inc. v. Henderson, New & Co., 774 F.2d 441, 444 (11th Cir.1985))). In other words, denial on grounds of futility is essentially a holding that the proposed amended complaint fails to state a claim upon which relief can be granted, and “the Supreme Court has clearly stated that ‘[t]he dismissal for failure to state a claim ... is a judgment on the merits.’ ” N.A.A.C.P. v. Hunt, 891 F.2d 1555, 1560 (11th Cir.1990) (quoting Federated Dep’t Stores, Inc. v. Moitie, 452 U.S. 394, 399 n. 3, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981)) (internal quotation marks omitted) (alteration in original).
SFM complains that it never offered a proposed amended complaint to the district court; but the substance of its proposed amendment was made clear in its appellate briefing. See Brief of Appellant at 28, SFM Holdings, Ltd., 600 F.3d 1334 (No. 07-11178) (maintaining that “the factual allegations of SFM’s complaint will support an action against [BAS] for breach of contract” (emphasis added)). In effect, SFM sought to add a count for breach of contract to its original complaint, without changing any of the factual allegations within it. Thus, this court in 2010 had before it everything we needed to determine whether SFM could state a viable claim for breach of contract. Based on our review of the factual allegations then presented and the two contracts at issue, we concluded that it could not.
2. Comparison of 2006 Contract Claims and 2012 Contract Claims
In any event, SFM’s argument is inconsequential given that it now has placed a new complaint before this court— its 2012 State Complaint — which may al *1345 lege new facts supporting breach of contract claims. Under the relitigation exception we must take care to “assess[] the precise state of the record and what the earlier federal order actually said.” Chick Kam Choo, 486 U.S. at 148, 108 S.Ct. 1684. As just noted, the facts alleged in the 2006 Federal Complaint were insufficient to state a claim for breach of either the PBA or IAA. But as explained in our discussion of SFM’s conspiracy count, supra at 1339— 43, the 2012 State Complaint advances a theory of harm that was not presented in its earlier federal lawsuit: the conversion of a portion of SFM’s funds through Lee’s allocation of them to cover Fisher’s losses. In addition, SFM alleges that BAS participated in this conversion by knowingly permitting intentional misallocation to take place, as well as by facilitating these acts of allocation in at least some instances and by concealing that these activities were occurring, all with the presumed purpose of protecting BAS’s own interests. Because this theory of liability was not presented to this court in SFM’s 2006 federal action, our 2010 ruling could not have decided the viability of any contract claims based on it. Count VII of the 2012 State Complaint, claiming that BAS breached the PBA, is such a claim. It expressly states that one ground for the asserted breach of that contract rests on the allegation that “BAS allowed Lee ... to disproportionately allocate assets between SFM’s account and Fisher’s account.” 2012 State Complaint ¶ 131(a). This claim, therefore, was improperly enjoined; SFM must be permitted to pursue it upon remand to state court.
BAS, in its briefing, argues that this court’s earlier holding — that “Banc of America Securities acted pursuant to the IA Agreement and the PB Agreement”— forecloses any further litigation of contract claims arising from this course of events. See SFM Holdings, Ltd., 600 F.3d at 1340. And it highlights several factual allegations that appear to be virtually identical, in all material respects, in both complaints. Appellee’s Brief at 16-17, 28-32. But, again, the fact that much of the narrative remains the same cannot detract from the differences that exist between the 2006 and 2012 complaints. The critical difference is that SFM now contends that it was harmed in a different manner than was previously alleged — with respect to a portion of its assets — and that BAS bore an active causal connection to this harm. These allegations were not before this court in 2010; thus, determining whether BAS’s conduct, as newly alleged, breached the PBA requires resolution of a legal claim that is not identical to those already decided. See Smith, 131 S.Ct. at 2373; Chick Kam Choo, 486 U.S. at 148, 108 S.Ct. 1684. Consequently, SFM cannot be enjoined from pursuing in state court its claim for breach of the PBA, based on the theory that BAS participated in a scheme to convert SFM’s assets by the mechanism of allocation between accounts.
On the other hand, to the extent that SFM’s claim for breach of the PBA in Count VII is based on its original theory of harm — Lee’s submission of a forged letter on which BAS relied to transfer SFM’s funds out of its account — it is foreclosed. See 2012 State Complaint ¶ 131(c). In our 2010 decision, we squarely faced this issue and concluded that BAS acted pursuant to the two contracts when it relied on the letter to execute the transfer. SFM Holdings, Ltd., 600 F.3d at 1340. In doing so, we cited a provision of the IAA establishing that BAS “shall incur no liability in acting upon [instructions of the client’s attorney-in-fact] provided such instructions reasonably appear genuine to [BAS].” Id. (quoting the IAA ¶ 3). In addition, we noted that the IAA “provided that [BAS] could accept ‘without any inquiry or inves *1346 tigation by [BAS] ... any other instructions concerning said Account’ from an introducing broker.” Id. (quoting the IAA ¶ 27).
In its 2012 State Complaint, SFM adds a few specifics to its recounting of this transaction, including the facts that Lee transmitted the letter by facsimile, that Lee has since admitted to having electronically pasted Dr. Melgen’s signature, and that the letter lacked letterhead and was neither witnessed nor notarized. 2012 State Complaint ¶¶ 41-42, 131(c). What it does not allege is that BAS knew that the letter was a forgery. The facts alleged therefore simply do not add up to present a new legal issue, a new claim, or a new theory of liability to be resolved by the state court. They are, in a word, immaterial, given the facts that were already before this court when we made our earlier determination. This issue is surely important to SFM because SFM maintains in its 2012 State Complaint that a substantial portion of its funds — between $7 and $8 million — were taken from it by this transfer. Id. ¶ 45. We hold, however, that SFM can permissibly be enjoined from pursuing its claim for breach of the PBA based on BAS’s transfer of these funds at Lee’s direction.
As for SFM’s other contract claims— Count V (breach of IAA), Count VI (breach of implied covenant in IAA), and Count VIII (breach of implied covenant in PBA) — they do not purport to rest on the newly alleged narrative of misallocation. See id. ¶¶ 117-27, 133-38. Moreover, none incorporates by reference some of the key paragraphs in the conspiracy count that purport to show BAS’s active participation in the scheme. See id. ¶¶ 117, 122, 128, 133 (incorporating by reference paragraphs 2-69, but not paragraphs 85-108). Accordingly, the district court acted within its authority when it enjoined SFM’s pursuit of these three claims, and it did not abuse its discretion in doing so.
IV. CONCLUSION
“[T]he [Anti-Injunction] Act’s core message is one of respect for state courts.” Smith, 131 S.Ct. at 2375. The Act’s reliti-gation exception permits federal court injunctions “only in rare cases,” id. at 2373, “to prevent state litigation of a claim or issue ‘that previously was presented to and decided by the federal court.’ ” Id. at 2375 (quoting Chick Kam Choo, 486 U.S. at 147, 108 S.Ct. 1684). In this context, “[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed.” Id. (quoting Atlantic Coast Line, 398 U.S. at 297, 90 S.Ct. 1739). And “[i]f we err, all is not lost,” as “[a] state court is as well qualified as a federal court to protect a litigant by the doctrines of res adjudicata and collateral estoppel.” S. Cal. Petroleum Corp. v. Harper, 273 F.2d 715, 719 (5th Cir.1960).
In this case, SFM has placed a complaint before a Florida state court that advances some legal claims that were not previously decided in its federal lawsuit. We therefore hold, as explained in finer detail throughout this opinion, that the district court lacked authority under the Anti-Injunction Act to enjoin SFM’s pursuit of its conspiracy claim (Count III) and one of its contract claims (Count VII), to the extent the latter claim is based on the newly alleged facts pertaining to BAS’s participation in a scheme to convert SFM’s assets by the mechanism of allocation between accounts. As to these claims, therefore, the district court’s injunction order is reversed.
With respect to certain of SFM’s contract claims — Counts V, VI, and VIII, as well as Count VII insofar as it is based on the forged letter transaction — this court’s *1347 2010 ruling may permissibly stand as a bar to their relitigation in state court. We therefore affirm the district court’s injunction order with respect to Counts V, VI, and VIII. As to Count VII, because we hold that this claim can proceed at least in part, we remand to the district court to determine whether to issue a more limited injunction with respect to it, or whether considerations of comity militate against constraining the state court’s ability to consider the full breadth of allegations and arguments in its resolution of this claim. See Chick Kam Choo, 486 U.S. at 151, 108 S.Ct. 1684 (“Because the injunction actually entered by the District Court was broader than the limited injunction we find acceptable, we must reverse the judgment approving a broad injunction and remand for entry of a more narrowly tailored order. Of course, the fact that an injunction may issue under the Anti-Injunction Act does not mean that it must issue.” (citation omitted)). Whether a more narrowly tailored injunction should issue against SFM’s prosecution of this claim, therefore, is a discretionary decision that we return to the district court.
AFFIRMED IN PART, REVERSED IN PART and REMANDED.

. We reject SFM’s "mandate rule” argument summarily. There is absolutely no basis for finding that this court, in determining that the district court lacked subject matter jurisdic-lion over the removed state action, also "impliedly held” that SFM's state court action should not be enjoined.

. It is undisputed that SFM and Dr. Melgen can be bound by the prior federal judgments. Although Dr. Melgen was not himself a party to the federal action, the district court’s in *1336 junction order correctly noted that "privity existed between SFM and Melgen,” as "Mel-gen is the president and principal of SFM’s general partner and took all of the relevant actions on behalf of SFM.” SFM Holdings, Ltd., No. 88, 06-CV-80652-KXR, at 11 n. 3 (S.D.Fla. Jan. 17, 2013).

. In this context, the term “state law” is shorthand for the preclusive effect that a state *1337 court “would accord one of its own judgments." See Semtek Int’l Inc., 531 U.S. at 508, 121 S.Ct. 1021; see also Taylor, 553 U.S. at 891 & n. 4, 128 S.Ct. 2161 (contrasting the rules that apply, under federal common law, to determine the preclusive effect of judgments issued in federal question as opposed to diversity cases).

. SFM also contests the premise that such exceptions do not exist under federal preclusion law, as applied in this circuit. See Appellants’ Reply at 24-25 (citing Maldonado v. U.S. Attorney Gen., 664 F.3d 1369, 1375 (11th Cir.2011)).

. “For well over a century, Florida courts have generally defined conversion as a wrongful act which deprives an owner of property of its use.” Joe Nagy Towing, Inc. v. Lawless, 101 So.3d 868, 876-77 (Fla.Dist.Ct. App.2012) (citing cases); see also Restatement (Second) of Torts § 222A (1965) ("Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.”).

. We note that the math in SFM’s 2012 State Complaint does not quite add up— SFM alleges that $9 million was taken through allocations to Fisher's account, 2012 State Complaint ¶¶ 76, 82, while between $7 to $8 million was stolen by the transfer based on the forged letter. Id. ¶45. These two figures total $16 or $17 million, which is somewhat greater than the $15 million that SFM alleges was lost in total.

. Our dissenting colleague acknowledges SFM’s allegation in the 2012 State Complaint that BAS concealed "the fact that profits had been allocated to Fisher," 2012 State Complaint ¶ 97, but he states that the conspiracy count "does not allege that Banc of America Securities knew that these profits belonged to SFM.” Partial Dissent at 1351. To the contrary, SFM expressly asserts that BAS had knowledge of Lee’s misallocation of profits from SFM to Fisher. 2012 State Complaint ¶ 90 (“Attempts by Won Lee to allocate losses between the SFM and Fisher accounts, and BAS’s knowledge of these attempts, can be seen [in an e-mail from Lee to Speer].”); id. ¶¶ 95-96 ("The scheme was furthered by allocating, and in some cases reallocating, trades to benefit Fisher. BAS was well aware that these allocations were taking place....”).

. We acknowledge our dissenting colleague's concern that our reading of SFM's conspiracy count takes the "ordinary demands from a broker and calls them conversion.” Partial Dissent at 1349. But we hasten to emphasize that our analysis here is conducted under the relitigation exception to the Anti-Injunction Act; we express no view regarding whether the allegations in SFM’s 2012 State Complaint actually would suffice to state viable claims under Florida law.?