[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16462
_____

D.C. Docket Nos. 8:16-cv-00022-EAK & 8:11-bkc-22258-MGW

IN RE: FUNDAMENTAL LONG TERM CARE, INC.,

Debtor.
_____

ESTATE OF JUANITA JACKSON,
ESTATE OF ELVIRA NUNZIATA,
ESTATE OF JOSEPH WEBB,
ESTATE OF ARLENE TOWNSEND,
STATE OF OPAL LEE SASSER,
ESTATE OF JAMES HENRY JONES,

Plaintiffs - Appellants,

BETH ANN SCHARRER,

Plaintiff,

versus

RUBIN SCHRON,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 19, 2017)

Before JORDAN and JULIE CARNES, Circuit Judges, and VINSON,[*] District Judge.

JULIE CARNES, Circuit Judge:

This case has a complex procedural history lasting more than a decade and spanning several state and federal venues.  It began when the estates of several deceased nursing-home patients (the "Estates" or "Appellants") brought a series of wrongful-death suits against a network of nursing homes.  These suits collectively resulted in $1 billion in empty-chair judgments against the network.  In an effort to evade enforcement of these and other liabilities, the defendant entities orchestrated a so-called "bust out" scheme under which they transferred the useful assets of the nursing-home business into a newly formed operating entity, leaving the core judgment debtor a judgment-proof shell company.

When the Estates learned that this judgment debtor had been stripped of its assets, they filed an involuntary Chapter Seven bankruptcy petition in the Middle

_____

[*] The Honorable C. Roger Vinson, Senior United States District Judge for the Northern District of Florida, sitting by designation.

2

District of Florida and initiated an adversary proceeding seeking to avoid, as fraudulent, the transfer of the debtor's assets.  The complaint named seventeen entities and individuals as defendants and described a wide-reaching scheme in which assets were secretly diverted in order to hinder, delay, and defraud the debtor's various judgment creditors.  One of the named defendants was real-estate investor Rubin Schron.

After careful consideration of the Estates' thirty-two claims for relief—and after granting the Estates an opportunity to comprehensively amend their lengthy and deficient initial complaint—the bankruptcy court dismissed Schron from the suit, concluding that his alleged connection with the transaction was speculative at best.  Claims against several additional defendants survived dismissal, and the case culminated in a twelve-day bench trial.  At its conclusion, the Estates settled with the remaining defendants for $24 million.  The bankruptcy court approved the settlement as fair and equitable on the condition that the Estates be permanently enjoined from pursuing any additional claims arising from the bust-out scheme against Schron individually.

The Estates appealed the dismissal of claims against Schron and the bankruptcy court's issuance of a permanent injunction with respect to Schron.  The district court for the Middle District of Florida affirmed both orders.  The Estates

3

now appeal those orders to this Court.  After careful review, and with the benefit of oral argument, we affirm.

## BACKGROUND

Although this appeal relates solely to the Estates' claims against Appellee Rubin Schron, the scope of the allegations against him requires us to review in some detail the underlying transaction and the course of proceedings before the bankruptcy court.[1]

## I.    The March 2006 Transaction

Trans Healthcare, Inc. ("THI") was founded in 1998 to operate nursing homes, assisted living facilities, and long-term acute-care hospitals throughout the United States.  Trans Healthcare Management, Inc. ("THMI") was a wholly owned subsidiary of THI and provided management services to THI until March 2006. By early 2006, numerous wrongful-death and negligence actions had been filed against THI and THMI on behalf of several nursing-home patients who had died while in THI and THMI's care.

Anticipating adverse judgments, the entities designed a transaction that would shield their assets from potential creditors without affecting their profitable

---

[1]  While the factual and procedural background of this case is complex, the scope of the appeal before us is relatively narrow.  As such, we paint in broad strokes.  For a detailed narrative of the underlying sequence of events, see *Estate of Jackson v. Gen. Elec. Capital Corp. (In re Fundamental Long Term Care, Inc.)*, 507 B.R. 359, 365–71 (Bankr. M.D. Fla. 2014).

4

operations (the "2006 Transaction").  Under the direction of Leonard Grunstein, a former real-estate lawyer, and Murray Forman, an investment banker, two new entities were created:  Fundamental Long Term Care, Inc. ("FLTCI") and Fundamental Long Term Care Holdings ("FLTCH") (together, the "Fundamental Entities").  In the first phase of the transaction, THMI sold all its assets to FLTCH for $9.9 million.  In the second phase, THI sold all its stock in the stripped-down THMI to FLTCI.  FLTCI therefore acquired all of THMI's liabilities but none of its assets.

THI remained an active corporation and continued operating nursing homes on a small scale following the transaction.  It was ultimately placed into a receivership and wound down.  THMI continued to exist as an insolvent subsidiary and the sole asset of FLTCI; both entities quickly became defunct.  FLTCH, on the other hand, was left with a substantial number of productive assets and continued operating the entities' broader network of nursing homes, generating millions of dollars of income, without being saddled with the millions of dollars in liabilities attributable to those entities.  To keep the network running, FLTCH rebranded the former THI/THMI facilities and created two new subsidiaries:  FCC, which provided operational and clinical support; and FAS, the administrative arm of the company.  Together, FLTCH, FCC, and FAS continued to operate in the same locations, and used the same employees and equipment, as did THI and THMI

5

prior to the 2006 Transaction.  At all relevant times, FLTCH was owned by

Grunstein and Forman.[2]

As noted, the Estates' complaint made allegations concerning Rubin

Schron's involvement in the above-described 2006 Transaction.  Schron is a

wealthy New York real-estate investor whose involvement with the THI network

began in 2002.  That year, Grunstein and Forman—Schron's lawyer and banker,

respectively—allegedly convinced Schron to fund the acquisition of 120 nursing

homes from an unrelated entity that was in the process of Chapter Eleven

liquidation.  The acquisitions were executed by an entity called ABE Briarwood,

and the facilities were subsequently leased to THI.  The complaint does not allege

that Schron ever held a direct ownership interest in THI, THMI, or FLTCH.

Similarly, there is no allegation that Schron was involved in designing or executing

the 2006 Transaction.  The Estates allege only that Schron was aware of Grunstein

and Forman's involvement in the 2006 Transaction and that Grunstein and Forman

acquired stakes in FLTCH as Schron's agents, but as to this last allegation, the

Estates articulate no basis for their conclusory assertion of an agency relationship.

---

[2]  FLTCI's sole shareholder was an individual named Barry Saacks.  Mr. Saacks is an elderly
former graphic artist who currently lives in a nursing home.  In the adversary proceeding,
Plaintiffs alleged that Grunstein deceived Saacks by placing FLTCI in Saacks's name without his
knowing involvement.  In fact, it was later shown that Saacks had put forward no money to
effectuate the transaction.  He was an owner in name only.

6

## II.    The Wrongful-Death Judgments

In the meantime, the estates of six deceased nursing-home patients pursued wrongful-death actions against THI and THMI in state court, alleging that the decedent patients had been abused, neglected, and injured by the negligent and reckless operation of THI's nursing homes in Florida and Pennsylvania.  The Estates had no knowledge at the time that the named defendants, THI and THMI, had been stripped of their assets.

To ensure that the Estates were kept in the dark, FLTCH's goal was to use the THI receivership to conceal the linked transfers long enough for the statute of limitations to run on any available fraudulent-transfer claims.  In furtherance of this plan, THI directed its counsel to withdraw representation of THI and THMI at around the same time as the relevant statutes of limitations ran.  The liability proceedings moved forward, and the various state courts in which these claims were pending ultimately entered "empty-chair" jury verdicts (that is, verdicts not contested by the defendants) against THI and THMI totaling more than $1 billion.

Despite FLTCH's efforts at concealment, the Estates eventually learned of the 2006 Transaction and the formation of the successor Fundamental Entities. They responded by initiating supplementary state-court proceedings against various entities and individuals alleged to have fraudulently transferred the FLTCH assets out of creditors' reach.  THI, THMI, the Fundamental Entities, Grunstein,

7

Forman, and Schron were specifically targeted. The Estates also initiated an involuntary Chapter Seven bankruptcy proceeding, naming FLTCI as debtor. A Trustee was appointed, and the Estates were identified as FLTCI's chief creditors.

Shortly after the Chapter Seven proceeding began, the Trustee expressed her intent to pursue fraudulent-transfer and related actions under the Bankruptcy Code against FLTCH and other entities involved in the 2006 Transaction. This cause of action overlapped with the Estates' already ongoing judgment-enforcement actions, which were based primarily on state-law fraudulent-transfer theories. In order to fend off these simultaneous actions, FLTCH filed a declaratory-judgment action in a New York court seeking a declaration that any fraudulent-transfer or similar claims relating to the 2006 Transaction were barred by the statute of limitations. The bankruptcy court enjoined the declaratory-judgment action after concluding that it would impermissibly interfere with the Trustee's ability to administer the Chapter Seven proceeding and protect the assets of the estate.

Having lost its bid for a New York declaratory judgment, FLTCH then sought an order from the bankruptcy court temporarily enjoining the Estates from pursuing their state-court judgment-enforcement actions. The bankruptcy court agreed that a multiplicity of parallel actions could lead to inconsistent outcomes and therefore entered an order establishing that all fraudulent-transfer and similar claims against the various defendants designed to unwind the 2006 Transaction

8

would be litigated in a single adversary proceeding before the bankruptcy court (the "Venue Order"). The result was that all pending state actions were enjoined pending resolution of the Chapter Seven adversary proceeding.

## III.    The Adversary Proceeding

Following the bankruptcy court's Venue Order, the Estates initiated an adversary proceeding with a two-count complaint for declaratory judgment, naming THI, THMI, the Fundamental Entities, Grunstein, Forman, and Schron as defendants (collectively, the "Defendants"), in addition to several other entities involved in the transaction. In Count I, the Estates sought a declaration that FLTCH and FLTCI were liable for the judgments against THI and THMI under a successor theory of liability. In Count II, they sought a declaration that Defendants were directly liable for the judgments against THI and THMI under a veil-piercing theory. The Trustee intervened in that proceeding to add a count for substantive consolidation of FLTCI and THMI. The Estates and the Trustee were later granted leave to amend the initial complaint and join their respective claims.

### A.    First Amended Complaint

In December 2013, the Estates and Trustee (together, "Plaintiffs") filed an enhanced First Amended Complaint—a 228-page tome containing 1,201 numbered paragraphs and twenty-two counts against Defendants and several additional entities. The twenty-two counts in the complaint can be broken into eight

9

substantive claims for relief:  one count for substantive consolidation of FLTCI and THMI; two counts for breach of fiduciary duty; four counts for aiding and abetting a breach of fiduciary duty; one count for successor liability; two counts for piercing of the corporate veil; three counts for alter-ego liability; eight counts for actual and constructive fraudulent transfer; and one count for conspiracy to commit a fraudulent transfer.  Asserting theories of direct or derivative liability, Plaintiffs' goal was to "unwind" the 2006 Transactions and recapture the FLTCH assets—wherever they may be held—in order to satisfy the Estates' various judgments against the THI/THMI network.

Defendants moved to dismiss all but the substantive-consolidation count.  In a thorough opinion, the bankruptcy court upheld several counts against several defendants and dismissed several without prejudice, granting leave to amend.  *See Estate of Jackson v. Gen. Elec. Capital Corp. (In re Fundamental Long Term Care, Inc.)*, 507 B.R. 359, 386 (Bankr. M.D. Fla. 2014).  Specifically, the court allowed the claims for fraudulent transfer against FLTCH, Forman, and Grunstein to go forward, declining to enforce the statute of limitations on those claims in light of allegations that these defendants had intentionally concealed facts that would have given rise to the claim within the limitations period.  As to the remaining claims, the bankruptcy court found the allegations "confusing, ambiguous, generalized, [and] conclusory," and noted overall that the pleading

10

required "considerable energy to read." *Id.* at 385–86 (internal quotation marks omitted). The court was nonetheless "not ready to conclude that the Plaintiffs could not allege additional facts that may potentially give rise to the causes of action the Court is dismissing." *Id*. at 386. The court instructed Plaintiffs to amend again and cure the pleading defects. *Id*.

## B.    Second Amended Complaint

Plaintiffs filed their Second Amended Complaint in April 2014. Instead of clarifying their initial slate of allegations and rehabilitating the dismissed claims, as they were directed to do, the Second Amended Complaint incorporated several hundred paragraphs of the First Amended Complaint by reference and offered a new, but largely repetitive, restatement of several claims. It then added four brand-new claims against several defendants. With only two exceptions, the bankruptcy court dismissed with prejudice each of the newly pled and re-pled claims, citing the same defects identified in the first motion to dismiss.

The court concluded that it was appropriate to dismiss the failed claims with prejudice because "any further attempts by Plaintiffs to amend their complaint would be futile or unfairly prejudicial to the Defendants." On that point, the court observed that, as a result of the parallel judgment-enforcement actions the Estates had already pursued in various state courts, Plaintiffs "had the benefit of almost complete discovery before filing their second amended complaint."

11

Most relevant to this appeal are the court's conclusions as to the claims against Schron. Plaintiffs attempted in their Second Amended Complaint to revive each of their original counts against Schron and to add four more: alter-ego liability; aiding and abetting a breach of fiduciary duty; abuse of process; conspiracy to commit abuse of process; negligence; constructive fraud; and improper post-petition transfer. The court dismissed each claim in turn, emphasizing the overarching flaw in the Plaintiffs' narrative: "[N]owhere in the complaint . . . is Schron alleged to have committed *any* act individually," nor did the allegations support a theory of derivative liability against Schron.

The court followed its decision with a final judgment in favor of Schron (the "Dismissal"), in which it stated that "[f]inal judgment is entered in favor of Schron on all claims that were or could have been asserted by Plaintiffs against him in the amended complaint and the second amended complaint."

## C.    Subsequent Proceedings

Schron was the only defendant fully dismissed from the adversary proceeding at the pleading stage. Three additional defendants were dismissed later via their motions for summary judgment. In the course of pre-trial proceedings, the bankruptcy court also granted Plaintiffs' motion to substantively consolidate THMI with the Chapter Seven debtor, FLTCI. The bankruptcy court then proceeded to consider the surviving claims during a twelve-day bench trial. At

issue in the bench trial were claims against Grunstein, Forman, and several related entities for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, successor liability, fraudulent transfer, and conspiracy to commit fraudulent transfer.

At the conclusion of trial, the bankruptcy court dismissed claims against three additional defendants but remained "unsure" as to "which of the Defendants on the buyers' side [of the 2006 Transaction] would be liable" under a successor liability theory, which was the only remaining theory under which Plaintiffs could prevail.  The court announced findings of fact and conclusions of law following trial and then ordered Plaintiffs and the remaining defendants, including FLTCH, Forman, and Grunstein, to mediate in hopes that a settlement could be reached.

Mediation was successful and ultimately yielded five settlement agreements. Under these agreements, Plaintiffs agreed to accept $18.5 million from FLTCH, FAS, THI, Forman, and Grunstein; $1.25 million from one of the law firms that defended THI and THMI against the Estates' earlier actions; $3.25 million from three additional entities involved in the 2006 Transaction; and $700,000 from THI's state-court receiver.  In total, these agreements yielded $23.7 million to cover Plaintiffs' damages.

Having earlier been dismissed from the adversary proceeding at the pleading stage, Schron was the sole non-settling Defendant.  Throughout the adversary

13

proceeding, the Estates had maintained their intention to pursue further state actions against Schron notwithstanding his early dismissal from the case.  Schron recognized the possibility of future action against him in a different venue and accordingly opposed the various settlements unless they were accompanied by a permanent injunction preventing the Estates from reviving or bringing any new state-court judgment-enforcement actions against him.  Thus, Schron's insistence on a permanent injunction reflected his legitimate fear that Plaintiffs would try to upend the resolution reached by the bankruptcy court after much litigation by the parties.

Likewise concerned that Plaintiffs would attempt to undo the final resolution that had been the goal of the complex and protracted adversary proceeding, the bankruptcy court issued a permanent injunction (the "Permanent Injunction" or "Injunction") prohibiting Plaintiffs from "pursuing claims against Rubin Schron arising out of the nucleus of facts set forth in the adversary complaint in this proceeding."  This injunction was integral to and a condition of the court's approval of the settlements, as the court determined that a settlement of the surviving claims could not be "fair and equitable" if it did not also finally resolve the claims against Schron.  In the bankruptcy court's view, an injunction prohibiting further litigation against Schron in another forum was "necessary" to protect the court's prior judgment as to Schron.  The court granted this permanent

14

injunction in December 2015 and then, after approving each of the settlement agreements, issued an opinion thoroughly discussing the basis for the Injunction and the authority on which it was issued.

The Estates appealed the Dismissal and the Permanent Injunction as to Schron to the Middle District of Florida, which affirmed both orders of the bankruptcy court. The Estates now appeal the district court's affirmance, asking this Court to reverse the bankruptcy court's orders with respect to Schron.

## STANDARD OF REVIEW

In a bankruptcy appeal, this Court functions as a second reviewer of the bankruptcy court's rulings and applies the same standards as the district court, which operates as the first level of appellate review. *Brown v. Gore (In re Brown)*, 742 F.3d 1309, 1315 (11th Cir. 2014). We therefore review a lower court's dismissal of a pleading for failure to state a claim *de novo*, accepting factual allegations as true and construing them in the light most favorable to the plaintiff. *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1066 (11th Cir. 2017). A lower court's decision to issue an injunction under the All Writs Act, 28 U.S.C. § 1651(a), is also reviewed *de novo*. *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 764 F.3d 1327, 1334 (11th Cir. 2014). We review a court's decision to grant or deny leave to amend a deficient pleading for abuse of discretion. *Troville v. Venz*, 303 F.3d 1256, 1259 (11th Cir. 2002).

## DISCUSSION

The Estates ask us to review the bankruptcy court's Permanent Injunction as to Schron as well as its Dismissal of all claims alleged in the First and Second Amended Complaints against Schron. We consider each of the Estates' challenges in turn.

## I.    Grant of Permanent Injunction

The Estates urge this Court to reverse the bankruptcy court's Permanent Injunction of any claims against Schron "arising out of the nucleus of facts set forth" in the Estates' Second Amended Complaint on two grounds: that the bankruptcy court lacked jurisdiction to enjoin state-law claims; and that, even if it had jurisdiction, the Permanent Injunction exceeded the court's authority under the All Writs Act and the Anti-Injunction Act. We have considered these challenges *de novo* and conclude that the Permanent Injunction was properly issued.

It is important first to clarify the scope of the Permanent Injunction, which is broad. By its language, the Injunction covers three categories of claims: (1) any claims against Schron "arising out of the nucleus of facts set forth" in the Second Amended Complaint; (2) the Estates' pending state-court judgment-enforcement actions against Schron, which had been temporarily enjoined pending resolution of the adversary proceeding; and (3) any claims against Schron "as the 'real party in interest'" in three pending state-court cases involving three of the Estates. Thus, in

16

addition to enjoining claims that the Estates had already unsuccessfully pled against Schron in their Second Amended Complaint (the "Dismissed Claims"),[3] the Injunction precludes the Estates from pursuing any new or old state or federal actions against Schron asserting any claim arising from the 2006 Transaction, including claims the Estates did not specifically raise in the adversary proceeding.

The Estates identify three types of claims that were not resolved through the adversary proceeding and were thus improperly foreclosed by the Injunction: proceedings supplementary under Florida Statutes § 56.29;[4] "real party in interest"

---

[3] This included the following claims against Schron:

    (1)    A common-law claim for aiding and abetting breach of fiduciary duties owed to THMI and THMI's creditors;

    (2)    Claims for a declaratory judgment establishing that Schron is liable as a successor to THI, THMI, and FLTCI and under veil-piercing and alter-ego theories;

    (3)    A claim for actual and constructive fraudulent transfers, as well as conspiracy to commit fraudulent transfers, under various state laws;

    (4)    A claim for abuse of process and conspiracy to commit abuse of process under Florida state law;

    (5)    A claim for negligence under Florida state law; and

    (6)    A claim to avoid certain postpetition transfers under the Bankruptcy Code.

[4] This statute permits a judgment creditor to seek avoidance of any transfers "made or contrived by the judgment debtor to delay, hinder, or defraud creditors." Fla. Stat. § 56.29(3)(b).

17

claims under state law;[5] and actions under 42 U.S.C. § 1983[6] (collectively, the "Potential Claims").  The Estates argue that the Potential Claims are theoretically distinct from the Dismissed Claims and thus were improperly swept into the Permanent Injunction.

### A.    Subject-Matter Jurisdiction

The Estates first argue that the bankruptcy court lacked jurisdiction to issue the Permanent Injunction.  We begin by outlining the legal principles that define the bankruptcy court's power to enjoin proceedings in foreign venues.

Any power by the bankruptcy court to issue the Permanent Injunction against non-bankruptcy proceedings must necessarily derive from the federal bankruptcy jurisdictional statute, 28 U.S.C. § 1334.  In relevant part, this statute provides that bankruptcy courts "shall have original . . . jurisdiction" over "all civil proceedings arising under title 11, or arising in or related to cases under title 11," § 1334(b), and "all the property, wherever located, of the debtor as of the

---

[5]  According to the Estates, a "real party in interest" action would involve the Estates moving under Florida civil-procedural rules to add Schron as the "real defendant" in the earlier liability proceedings against THI and/or THMI on grounds that Schron was "materially interested in the subject matter of [the] suit" because he contributed to the payment of attorneys' fees in defense of those entities.

[6]  Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  The Estates' theory of § 1983 liability is unclear.

18

commencement of such case, and of property of the estate," § 1334(e)(1).  The

bankruptcy court's jurisdiction over cases "arising in or related to" a bankruptcy

proceeding is sometimes referred to as "related-to jurisdiction" and is the focus of

our analysis on appeal.

Bankruptcy courts plainly lack jurisdiction over outside proceedings that do

not affect the debtor.  *Celotex Corp. v. Edwards*, 514 U.S. 300, 309 n. 6 (1995).

But the phrase "related to"—which is not defined in the Bankruptcy Code—"must

be read to give [bankruptcy courts] jurisdiction over more than simply proceedings

involving the property of the debtor or the estate."  *Id.* at 308; *see also id.* at 307–

08 ("Congress did not delineate the scope of 'related to' jurisdiction, but its choice

of words suggests a grant of some breadth." (footnote omitted)).

The Third Circuit has held that a civil proceeding is "'related to' a

[bankruptcy] proceeding if the outcome of [the] proceeding could *conceivably*

have any effect on the estate being administered in bankruptcy."  *Nuveen Mun.*

*Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*,

692 F.3d 283, 293–94 (3d Cir. 2012) (second alternation in original) (emphasis in

original) (quoting *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984))

(internal quotation marks omitted).  We have indicated our agreement with that

principle.  *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*, 910 F.2d 784, 788

(11th Cir. 1990) ("We join the majority of the circuits that have adopted the *Pacor*

19

formulation."); *see also Celotex*, 514 U.S. at 308 (agreeing "with the views expressed by the Court of Appeals for the Third Circuit in [*Pacor*], that 'Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate'"); *Wortley v. Bakst*, 844 F.3d 1313, 1320 (11th Cir. 2017) (applying the "conceivable effect" test from *Lemco Gypsum* to conclude that the bankruptcy court had related-to jurisdiction over certain state-law tort claims).

Under this standard, a bankruptcy court can enjoin any civil action "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action" or "in any way impacts upon the handling and administration of the bankrupt estate." *Celotex*, 514 U.S. at 308 n.6 (quoting *Pacor*, 743 F.2d at 994) (internal quotation marks omitted); *see also Wortley*, 844 F.3d at 1318–20. The overriding question, then, is whether the claims covered by the Permanent Injunction could "conceivably" affect the administration of the bankruptcy estate, especially in light of the substantive consolidation of FLTCI (the named debtor) and THMI (the Estates' chief judgment debtor). We conclude that they could.

Consider the simple example of a state-law judgment under Florida Statutes § 56.29 determining that Schron was the recipient of a fraudulent transfer from THMI and is thus liable, to the extent of that transfer, for the Estates' wrongful-death judgments against THMI. If, pursuant to that judgment, Schron were

20

ordered to disgorge any prior transfer of assets, then the sum transferred would necessarily reenter, and enlarge, the joint FLTCI/THMI bankruptcy estate. It is clear that such an outcome would, at the least, "conceivably" impact the size and the administration of the estate.

The Estates ask us to focus on a somewhat more complicated example: an action to avoid (that is, undo) fraudulent transfers from THI, which is THMI's former parent and the Estates' secondary judgment creditor. The Estates assert that certain of the claims they wish to bring against Schron "are individual, grounded in state law and [ ] designed to collect on the Estates' judgments against THI—an entity that 'has not been substantively consolidated into the Debtor, [or] determined to be the alter ego of or successor to the debtor.'" According to the Estates, because THI is an entirely separate entity from debtors THMI and FLTCI, any action seeking to hold Schron liable for the Estates' judgments against THI will have "no conceivable impact" on the property of the debtor's estate.

We disagree. As noted, the Estates wish to pursue fraudulent transfer claims under state law, with the goal of recovering assets that were transferred by THI through FLTCI and, finally, to FLTCH. If a state court were to find those transfers to be non-fraudulent, then the FLTCI estate would have a hard time succeeding on its own fraudulent-transfer claim against FLTCH. In other words, because THI was the entity from which the 2006 Transaction originated, a finding in state court

21

that THI's transfers were not fraudulent would undermine the debtor's central avoidance claim against FLTCH—the primary transferee of THI's assets. Such a result would no doubt impact the size of the estate and the parties' various efforts to reverse the 2006 Transaction. Significant repercussions would likewise result from a state-court judgment establishing that the transfers from THI were, indeed, fraudulent and avoidable under state law and that Schron himself, as an alleged recipient of assets from FLTCH, was liable for the wrongful-death judgments against THI. In that case, the debtor's avoidance claims against FLTCH would be strengthened by the possibility of recovery against Schron himself as a downstream transferee.[7] In other words, the assets that would satisfy the Estates' judgments against THI necessarily flowed through THMI—and therefore through FLTCI, and therefore through the bankruptcy estate—before reaching Schron. Any assets transferred to Schron would have to pass back through the bankruptcy estate before they could be used to satisfy the Estates' wrongful-death judgments. The structure

---

[7] The bankruptcy court explained the scenario as follows:

> The fact that the assets that were allegedly transferred to Schron . . . belonged to THMI is crucial. If that is the case, what difference does it make if the creditors are going after those assets in an attempt to collect on a judgment against THI? How can the [Estates] collect on [their] judgment against THI by seeking to undo a transfer of assets that belong to THMI—whether under an alter ego or fraudulent transfer theory—without interfering with the administration of this estate?

22

of the transaction makes it impossible to envision an action seeking recovery from Schron for the THI debts that would not implicate the THMI estate and carry the potential to deconstruct the bankruptcy court's resolution of the dispute.

The Estates have identified no scenario in which a claim to recover on a judgment against THI would not impact the size and administration of the bankruptcy estate, as well as the debtor's potential claims with respect to the 2006 Transaction. As a result, we conclude the bankruptcy court possessed subject-matter jurisdiction under § 1334(b) to enjoin claims against Schron arising from the 2006 Transaction.

### B.    Authority under the All Writs Act

The next question the Estates ask us to consider is whether the bankruptcy court had statutory authority to enjoin pending and future state-court proceedings under the particular circumstances of this case.

The bankruptcy court justified the Permanent Injunction under the All Writs Act, 28 U.S.C. § 1651, which states that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Authority under the All Writs Act is limited by the Anti-Injunction Act, which provides:

> A court of the United States may not grant an injunction to stay proceedings in a State court except [1] as expressly authorized by Act of Congress, or [2] where necessary in aid of its jurisdiction, or [3] to protect or effectuate its judgments.

23

28 U.S.C. § 2283. If an injunction falls within one of the Anti-Injunction Act's three exceptions, then it is authorized under the All Writs Act. *See Burr & Forman v. Blair*, 470 F.3d 1019, 1028 (11th Cir. 2006) ("[T]he sole relevant inquiry is whether the injunction qualifies for one of the exceptions to the Anti-Injunction Act."). The Anti-Injunction Act exceptions "are narrow and are not [to] be enlarged by loose statutory construction." *SFM Holdings*, 764 F.3d at 1335 (alternation in original) (quoting *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2375 (2011)) (internal quotation marks omitted). As such, "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed." *Id.* (alternation in original) (quoting *Smith*, 131 S. Ct. at 2375) (internal quotation marks omitted).

The bankruptcy court concluded that the Permanent Injunction was "necessary in aid of its jurisdiction" and necessary "to protect or effectuate its judgments" under the second and third Anti-Injunction Act exceptions. The district court agreed with the bankruptcy court's rationale, finding that "the Bankruptcy Court's injunction clearly seeks to protect the integrity or enforceability of its existing orders, i.e. its order dismissing the Bankruptcy Estates' claims against Schron, as well as the settlement agreement between the Probate Estates, the Trustee, and the remaining defendants." We agree.

24

The Anti-Injunction Act's third exception, often called the "relitigation exception," permits injunction of state-court actions "to protect or effectuate [the federal court's] judgments." *See SFM Holdings*, 764 F.3d at 1335. This exception "is designed to implement well-recognized concepts of claim and issue preclusion." *Id*. (quoting *Smith*, 131 S. Ct. at 2375) (internal quotation marks omitted). We have, however, acknowledged that "the relitigation exception is narrower" than traditional principles of claim preclusion and "only authorizes an injunction to prevent state litigation of a claim or issue that previously was presented to and decided by the federal court." *Id.* at 1336 (quoting *Smith*, 131 S. Ct. at 2375) (internal quotation marks omitted).

Given this framework, there is no question that the Injunction was proper under the third Anti-Injunction Act exception as to the Dismissed Claims—*i.e.*, the claims specifically asserted in the Second Amended Complaint against Schron. These matters were "presented to and decided by" the bankruptcy court when it considered and dismissed the Second Amended Complaint with prejudice as to Schron.

The Potential Claims, on the other hand, were not asserted in the Second Amended Complaint and thus were not decided by the bankruptcy court. While the relitigation exception is therefore not applicable, we conclude that an

25

injunction directed against the Potential Claims was "necessary in aid of [the court's] jurisdiction" under the second Anti-Injunction Act exception.

We have consistently held that "state *in personam* proceedings that threaten to make complex multidistrict litigation unmanageable" may be enjoined in aid of the court's jurisdiction. *Juris v. Inamed Corp.*, 685 F.3d 1294, 1339 (11th Cir. 2012) (internal quotation marks omitted); *see also Estate of Brennan ex rel. Britton v. Church of Scientology Flag Serv. Org., Inc.*, 645 F.3d 1267, 1274 (11th Cir. 2011). To fall within this exception, the injunction must be "necessary 'to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case.'" *Wesch v. Folsom,* 6 F.3d 1465, 1470 (11th Cir. 1993) (quoting *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970)). For instance, in *Battle v. Liberty National Life Insurance Co.*, we held that a district court that had issued a final judgment in a complex and lengthy class action, and expressly retained jurisdiction over the settlement, properly enjoined a subsequent state-court suit involving substantially similar claims. 877 F.2d 877, 880–83 (11th Cir. 1989). The underlying case involved "years of litigation and mountains of paperwork," and we concluded that any future state-court judgment "would destroy the settlement" the parties had reached and "nullify [the] court's

work in refining its Final Judgment" while "subject[ing] the parties to added expense and conflicting orders." *Id*. at 882 (internal quotation marks omitted).

We agree with the bankruptcy court that "[t]his case, although not involving a class action or multi-district litigation, falls squarely within the Eleventh Circuit's decisions in *Battle*" and subsequent, similar cases. *See, e.g.*, *Wesch*, 6 F.3d at 1470–71 (affirming injunction on finding that "virtual equivalent of a *res* to be administered" existed where the district court had "invested a great deal of time and other resources in the arduous task of reapportioning Alabama's congressional districts"); *Juris*, 685 F.3d at 1339–40 (concluding that "paradigmatically complex" litigation that ended in carefully crafted settlement "presumptively satisfie[d]" the second Anti-Injunction Act exception under *Battle* and *Wesch*).

The bankruptcy court's description of the course of proceedings in this matter merits repeating:

> What started off as six negligence or wrongful death lawsuits has morphed into 25 lawsuits (including adversary proceedings) and 15 appeals before 11 courts and 17 judges in five states over 11 years. . . . [I]t quickly became apparent the Probate Estates and Trustee were pursuing identical claims against identical parties arising out of the same nucleus of operative facts— i.e., the March 2006 transactions—in more than one forum (state court, district court, and bankruptcy court). . . .
>
> This Court (and others) have devoted years of time and effort to this exceedingly complex litigation. . . . The complaints in this proceeding . . . totaled nearly 300 pages and contained more than 1,600 numbered paragraphs [and] alleged 32 claims for relief against 17 parties. . . . The mediation produced four settlements that will bring nearly $24 million into

27

the bankruptcy estate . . . and, perhaps more important, resolve this adversary proceeding and bankruptcy case in their entirety.

The scale of this proceeding, the broad scope of the Estates' claims in the First and Second Amended Complaints, and the fact that the Estates have had several opportunities to develop their claims against Schron justify the court's injunction of actions that will raise claims substantially similar, if not identical, to the claims that have been dismissed.

It is also important to note that the bankruptcy court's approval of the settlements as fair and equitable was expressly conditioned on the issuance of the Permanent Injunction. In the bankruptcy court's view, a broad settlement agreement that left the door open to state actions alleging analogous claims against Schron would "unduly prejudice[] Schron." The bankruptcy court's careful consideration of the Estates' claims and substantial efforts in reaching a fair, equitable, and comprehensive resolution of this matter would be undone by future state-court adjudications raising the same claims. And because the Estates have been unequivocal about their intent to pursue state action against Schron, the necessity of the Injunction in aid of the bankruptcy court's jurisdiction is clear.

We thus agree with the lower courts that the injunction of state-court claims against Schron "arising out of the nucleus of facts set forth" in the Second Amended Complaint was authorized under the All Writs Act. We therefore

28

conclude that the bankruptcy court properly issued the Permanent Injunction as to

Schron, and we AFFIRM the decisions of both lower courts on these issues.

## II.    Dismissal of Second Amended Complaint with Prejudice

The Estates also challenge the bankruptcy court's order of final dismissal as

to Schron, arguing that the courts below failed to properly analyze allegations that

Schron (1) is an alter ego of debtor FLTCI; (2) aided and abetted a breach of

fiduciary duty by the board of directors of THMI; (3) committed and benefited

from fraudulent transfers of the assets of THI and THMI, thus committing

constructive fraud; and (4) committed abuse of process and conspired to commit

abuse of process.  If their arguments as to the merits of these claims fail, the

Estates ask this Court to reverse the bankruptcy court's decision to dismiss with

prejudice and provide them another opportunity to amend their complaint.

We agree with the courts below that the Second Amended Complaint failed

to sufficiently allege any causes of action against Schron personally, and we find

no abuse of discretion in the bankruptcy court's decision to dismiss those claims

with prejudice.

### A.    Sufficiency of the Allegations

The Estates wish to revive several distinct claims against Schron that the

bankruptcy court dismissed.  We discuss each in turn, taking the factual allegations

29

contained in the Second Amended Complaint as true and construing them in the

light most favorable to the Estates.

### 1.    *Claims Arising from the 2006 Transaction*

Importantly, there is no allegation in the Complaint that Schron took any

affirmative act with respect to the 2006 Transaction.  Indeed, the Complaint states

that "Grunstein and Forman undertook all the actions described [ ] regarding the

transfers of the assets of THI and THMI."  As such, for the Complaint to have

stated a claim against Schron for alter-ego liability,[8] aiding and abetting breach of

fiduciary duty,[9] and fraudulent conveyance[10] in connection with the 2006

Transaction, it must have alleged that Grunstein and Forman were acting as

Schron's agents.  The bankruptcy court concluded that the Complaint failed to

properly allege such an agency relationship:  "The Plaintiffs, however, fail to

---

[8]  The Complaint alleged that FLTCH, Grunstein, Forman, and Schron were alter egos of FLTCI, the debtor, and that they were therefore derivatively liable for FLTCI's debts.

[9]  The Complaint alleged that various entities involved in the 2006 Transaction breached fiduciary duties owed to THMI's creditors and that Grunstein, Forman, and Schron aided and abetted those breaches.

[10]  The Estates sought to avoid the transfer of assets to FLTCH through the 2006 Transaction under a theory of fraudulent conveyance.  To establish liability for a fraudulent transfer under the Bankruptcy Code and the Uniform Fraudulent Transfer Act (which the relevant states have adopted), a plaintiff must show that property was transferred by the defendant for less than reasonably equivalent value at a time when the transferor was insolvent or in a manner that left the transferor insolvent.  *See* 11 U.S.C. § 548(a)(B); *see also* Fla. Stat. § 726.105(1)(b).  In this case, the debtor, FLTCI, was the immediate transferor but was allegedly controlled by its alter egos Grunstein and Forman.  The Estates alleged that Grunstein and Forman were, in turn, acting as agents of Schron.

30

sufficiently allege the facts necessary to impute any knowledge by Forman and Grunstein to Schron or to bind him by their acts for purposes of their alter ego and aiding and abetting claims."

We agree. The Estates baldly claim that Grunstein and Forman exercised rights belonging to Schron "as Schron's agent, lawyer and fiduciary" in planning and executing the 2006 Transaction, but they fail to allege that Schron acknowledged, accepted, or instructed the two men to move forward with the Transaction—nor do they make the necessary connections to demonstrate how Schron stood to gain from the Transaction. That is, while Grunstein and Forman may have sometimes functioned as Schron's agent, lawyer, or fiduciary in other contexts, the Complaint does not allege that they operated in this capacity for purposes of the 2006 Transaction.

First, and importantly, the allegations do not plausibly establish that Schron ever held an ownership interest in THI, THMI, FLTCI, or FLTCH. And to suffice, a factual allegation must do more than speculate that a right to relief might exist. It must "state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). The Complaint falls short of this standard. It states in pertinent part: "Grunstein informed Schron about FLTCH taking over the operations of [THI]," and Grunstein and Forman ultimately "agreed to give Schron an option to buy one-third of FLTCH for a nominal amount, so that

31

Schron also benefitted from the transaction." An option agreement was subsequently executed among FLTCH, Forman, Grunstein, and "*Schron's entity.*" (Emphasis added). It is not clear which "entity" this latter allegation refers to, though the Complaint later implies that Quality Health Services LLC ("QHS") was the recipient of the option. Yet, even stretching an implication into an allegation, the Complaint offers no explanation as to how, exactly, QHS was "Schron's entity." The Estates argue that the use of this possessive descriptor clearly alleged ownership, but there is no specific allegation regarding Schron's ownership of QHS, nor is there any allegation that Schron knew that "his entity" was purchasing such an option. Elsewhere in the complaint, the Estates allege that "FLTCH is owned by Forman and Grunstein," with no mention of any one-third interest held by "Schron's entity." Clearly, these allegations are insufficient to identify Schron as having any interest in these entities. And it is important to remember that these allegations were not made at a point in the litigation when Plaintiffs lacked the necessary knowledge to fill in the blanks. Plaintiffs had enjoyed the opportunity for extensive discovery in state-court proceedings by the time of the Second Amended Complaint.

In another attempt to find some way to place Schron in the Transaction, the Complaint identifies another entity, SWC Property Holdings, LLC ("SWC"), as "Schron's entity" and then alleges that SWC played a role in "forcing" the sale of

32

THMI.  Even if it had coherently explained SWC's involvement in the Transaction, the Complaint still fails to specify the nature of Schron's interest in or control over SWC during the relevant timeframe.[11]

The Complaint also alleges plainly contradictory facts regarding the fiduciary relationship between Schron, on the one hand, and Grunstein and Forman on the other.  Oddly, the Complaint directly incorporates several factual allegations that were contained in a separate lawsuit Schron had filed against Grunstein and Forman, in which Schron alleged that Grunstein and Forman had executed the 2006 Transaction "surreptitiously," without his knowledge or involvement, and for

---

[11]  The bankruptcy court characterized the Complaint's allegations regarding QHS and SWC as follows:

As best the Court can tell, the Plaintiffs allege that one of three different people or entities actually own the one-third option [in FLTCH that the Estates claim is Schron's]. In one instance, the Plaintiffs allege that "[Grunstein] and Forman *agreed to give Schron* an option to buy one-third of FLTCH for a nominal amount," although they do not allege they actually gave Schron himself the option.  In other instances, the Plaintiffs allege that "Schron's entity"—SWC Property Holdings, LLC—received the option, without alleging whether Schron has any ownership interest in that entity.  If that is not confusing enough, the Plaintiffs allege in still other places that "Schron's entity"—presumably SWC Property Holdings—designated Quality Health Services, LLC to take title to the option. Again, there is no allegation regarding Schron's ownership interest—if any—in Quality Health Services.  Trying to harmonize those seemingly contradictory allegations, it appears the Plaintiffs are alleging that Schron benefitted from the March 2006 transaction because Forman and Grunstein contracted with SWC Property Holdings to convey a one-third option to Quality Health Services.  Without any allegation that Schron actually owns SWC Property Holdings or Quality Health Services, however, the Plaintiffs cannot plausibly state a claim that Schron personally benefitted from the March 2006 transaction.

their own benefit, in breach of duties they owed to him. Plaintiffs appear to think these allegations to be an admission by Schron that the two men functioned as his agents. But, to the contrary, Schron's Complaint alleged that the two men had failed to act as his agent in the 2006 Transaction. As the bankruptcy court noted, this is a problematic inconsistency because, at best, Plaintiffs offer only a conclusory assertion that Grunstein and Forman were acting on Schron's behalf, which they then directly contradict by specific allegations from Shron's incorporated complaint that assert quite the opposite. The Estates had no obligation to allege or incorporate facts from Schron's lawsuit against Forman and Grunstein. That they did so and included allegations that directly contradict the central premise of their claim—that Grunstein and Forman were acting on Schron's behalf—is, to say the least, not helpful.

Upon careful review of the pleadings, we agree with the bankruptcy court that the Complaint's allegations are too vague and inconsistent to successfully state a claim against Schron under an agency theory of liability. The failure to properly allege an agency relationship dooms the Estates' claims for alter-ego liability, aiding and abetting breach of fiduciary duty, and fraudulent conveyance with respect to the 2006 Transaction. We therefore AFFIRM the bankruptcy court's dismissal of these claims.

34

### 2.    *Claims Arising from 2012 Settlement Agreement*

The Estates also seek to revive a separate fraudulent-conveyance claim against Schron involving a 2012 transaction in which Schron was a direct participant.  In January 2012, the THI receiver entered into an agreement with several of the Defendants—including Schron—whereby the receiver assigned to these defendants all claims the THI estate held against any third parties (the "2012 Settlement Agreement").  In exchange, these defendants collectively paid the receiver $700,000.  Schron personally supplied $200,000 of the purchase price.

According to the Second Amended Complaint, these claims included "any and all claims that THI has or may have against Schron," "THI's rights under the attorney-client privilege and the work-product doctrine," and a legal malpractice claim against the lawyers that represented THI and THMI in the wrongful-death cases that resulted in the empty-chair judgments.  The Estates maintain that these claims—and the malpractice claim in particular—have a "potential value" of "well over $2 billion."  The Complaint specifically alleged that, because the wrongful-death judgments totaled $1 billion and had been accruing interest over a number of years, the potential malpractice claim alone could, "[w]ithout a doubt," be worth

35

more than $2 billion.[12]  The purported discrepancy between the supposed value of these claims and the $700,000 purchase price—coupled with the fact that THI was insolvent at the time of the Agreement—allegedly rendered the transfer fraudulent under various state laws.

To state a plausible fraudulent-conveyance claim with respect to the 2012 Settlement Agreement, the Estates were required to allege facts demonstrating that the claims Schron received were not reasonably equivalent in value to the price he paid.  "Reasonably equivalent value" does not mean dollar-for-dollar equivalence. *See Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251, 1257 (11th Cir. 2013).  Instead, courts make informed judgments as to asset valuation in light of the totality of the circumstances.  Thus, in order to have "nudged their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, the Estates must have offered more than a bald assertion that the malpractice claim (in addition to the other unidentified claims Schron acquired) had, as alleged, a

---

[12]  The Second Amended Complaint explained:

> Damages in a legal malpractice action are the amount of damages sustained by the client as [a] result of malpractice.  As of the date of this filing, the THI Enterprise has sustained damages in the amount of $1.4 billion, plus accruing interest.  Three of the Plaintiffs['] Estates here still have pending litigation against the THI Enterprise.  Without a doubt, the potential value of the THI Enterprise's claims could be well over $2 billion.

36

potential value of more than $2 billion, or at the least that the value exceeded $700,000.

We agree with both lower courts that the Second Amended Complaint failed to allege that, under the circumstances present at the time, $700,000 was not a reasonably equivalent value for the transferred claims. While the Complaint does allege that a successful malpractice claim is theoretically worth at least the value of the underlying judgment, it does not address the potential costs of pursuing those claims, the likelihood that the underlying judgments might be reversed on appeal, or—most importantly—the probability of the claim succeeding. In fact, the Complaint does not set out any facts tending to show that the claims were worth upwards of $1 billion, actually or in theory.

For instance, in at least two portions of the Complaint, the Estates note that certain of the wrongful-death judgments against THI and THMI were subject to appeal in state and federal court. Such allegations introduce the possibility that a portion of the underlying empty-chair judgments may be reversed. A reversal of those underlying judgments would, in turn, directly diminish the value of the malpractice claim. Thus, under the allegations of the Complaint itself, the expected value of that claim cannot be 100% of its potential value. The Complaint fails to acknowledge the connection between the alleged appeals and its valuation of the malpractice claim, and accordingly, it fails to discount the potential value of

the malpractice claim by the probability that those reversals will succeed.  The $2 billion valuation is necessarily an overstatement.

More problematically, the Estates fail to address a glaring inconsistency between their valuation of the malpractice claim and their broader fraud argument. In order to succeed, the action for legal malpractice would require Schron to step into the shoes of the THI receiver and establish that THI's attorneys negligently failed to prevent the $1 billion in empty-chair judgments against THI.  This theory of liability arguably has some initial facial appeal, given the allegation that THI's defense counsel ultimately withdrew its representation of THI in those actions. But elsewhere in the Complaint, the Estates assert that THI's defense counsel withdrew its representation only at the express instruction of the THI receiver— who was, in turn, acting at the behest of Schron and the other Defendants—in furtherance of a common scheme to conceal the 2006 Transaction from creditors. Thus, under the Estates' description of the circumstances, establishing a viable malpractice claim would require a court to find THI's counsel liable to the THI receiver (and, derivatively, to Schron) for its obedience to the receiver's direct instructions.  The chances of success on such a theory are clearly slim.  And as the bankruptcy court observed, this conceptual inconsistency is plain from the face of the Second Amended Complaint.

Thus, the allegations contained in the Second Amended Complaint do not plausibly assert that the malpractice claim is worth the full value of the underlying empty-chair judgments (plus interest), as the Complaint supposes. Such a valuation would require an assumption that the malpractice claim has a near-absolute certain chance of succeeding. The Complaint's own allegations make such an assumption implausible. In the absence of any countervailing allegations to overcome these issues and shore up the $2 billion valuation, the Complaint does not state a claim that $700,000 was less than reasonably equivalent value for the claims under the circumstances.[13]

For these reasons, we conclude that the Second Amended Complaint does not contain sufficient factual detail to plausibly assert that the malpractice claim, or any of the other unidentified claims transferred through the 2012 Settlement Agreement, were sold for less than reasonably equivalent value. We therefore

---

[13] As the bankruptcy court put it, the Estates' valuation

> fails to consider, among other things, that the more than $1 billion in judgments largely consist of punitive damages claims; all but one of those judgments is currently on appeal; and Schron's ability to prevail on the potential malpractice claims—which are based on the allegation that the lawyers for THI and THMI negligently withdrew their defenses of those entities in the state-court wrongful death cases—is seriously diminished because the lawyers took their direction from the THI Receiver (and Schron would be standing in the shoes of the THI Receiver pursuing the malpractice claims).

39

AFFIRM the bankruptcy court's dismissal of the fraudulent-conveyance claim arising from the 2012 Settlement Agreement.

### 3.    Abuse of Process and Conspiracy to Commit Abuse of Process

Finally, the Estates argue that their abuse-of-process claims against Schron were improperly dismissed.  The Estates allege that Schron and the other defendants committed an abuse of process by asserting unauthorized defenses on behalf of THMI in order to advance their own interests.  These claims relate to the 2012 Settlement Agreement between the Defendants and the THI receiver, discussed *supra*.  In addition to assigning THI's claims against third parties to the Defendants, the 2012 Agreement purported to settle all claims that THI might have had against each of the Defendants.  It also purported to assign to the Defendants the right to defend THMI in state-court proceedings against THMI brought by the Estates.  After the 2012 Settlement Agreement was executed, the Defendants took control of the defense of THMI in state court.

Under Florida law, which governs this claim, "[a]buse of process involves the use of criminal or civil legal process against another primarily to accomplish a purpose for which it was not designed."  *See Bothmann v. Harrington*, 458 So. 2d 1163, 1169 (Fla. 3d DCA 1984).  An abuse of process has not occurred unless the process is used to accomplish an immediate purpose other than that for which it was designed.  *Id.*  The fact that a party may be motivated by incidental or

concurrent benefits of the use of process is not sufficient to constitute an abuse.
*See S & I Investments v. Payless Flea Mkt., Inc.*, 36 So. 3d 909, 917 (Fla. 4th DCA
2010) ("There is no abuse of process . . . when the process is used to accomplish
the result for which it was created, *regardless of an incidental or concurrent
motive of spite or ulterior purpose*." (emphasis in original) (quoting *Bothmann*,
458 So. 2d at 1169)).

As both lower courts noted, the 2012 Settlement Agreement was likely
unenforceable, and Defendants' conduct in subsequent state-court proceedings was
improper.  Indeed, the parties do not dispute that Defendants' counsel's
representation of THMI pursuant to the 2012 Settlement Agreement was
unauthorized and that Defendants misled various state courts with respect to the
nature of THMI's defense.[14]  But the question before us is not whether Defendants
properly exercised their rights under the Agreement or whether the Agreement
itself was enforceable as a matter of law.  The sole question is whether the

---

[14]  There were two major problems with the 2012 Settlement Agreement and with the
representation that followed.  First, the agreement was between the Defendants and the THI
receiver.  But at that point in time, THI did not have an obligation or a right to indemnify or
otherwise represent THMI in litigation filed against it.  In effect, then, the Agreement purported
to sell Defendants a right that THI did not actually possess.  As a result, none of the Defendants
was authorized at any time to fund or direct the legal defense of THMI.  And yet that is precisely
what they did.  Second, when Defendants took over the defense of THMI, they misrepresented to
the courts and to the Estates that they had "a duty to indemnify and a right to defend" THMI
when, in fact, they did not.  According to the Second Amended Complaint, counsel representing
THMI also failed to disclose that it simultaneously represented the Defendants and was,
therefore, "protecting and serving the Defendants" rather than or in addition to THMI.

41

Complaint alleged that the Defendants' defense of THMI under the Agreement constituted a use of civil process that was intended to achieve an immediate purpose for which it was not designed. *See Bothmann*, 458 So. 2d at 1169.

Thus, to plausibly state a claim for abuse of process, the Complaint must have alleged that the defense of THMI was not primarily designed for the simple goal of defending THMI. We agree with the bankruptcy court that the Complaint failed to so allege. While Schron and the other Defendants may have hoped that the defense of THMI would serve their own, separate interests, the only immediate impact of that defense in the state-court actions was to defend THMI. This is precisely the result for which such process was created. The fact that a successful defense of THMI would yield incidental benefits to Schron and other Defendants does not convert their unauthorized defense of THMI into an abuse of process under Florida law. All that the Complaint alleges is that the Defendants asserted a defense on THMI's behalf. This is not, by itself, sufficient to allege an abuse of process.[15]

---

[15] As the bankruptcy court noted,

> It would be one thing if the Plaintiffs were alleging an abuse of process claim based on FAS allegedly orchestrating a defense on THMI's behalf before THMI's counsel withdrew in 2010. At least there, the Plaintiffs would have a plausible claim that FAS (or some of the other Defendants) were not using their defense of THMI to avoid liability but rather to stall the litigation long enough for the statute of limitations to run on any fraudulent transfer claim arising out of the March 2006 transaction. That would arguably

For the above reasons, we AFFIRM the bankruptcy court's dismissal of claims of abuse of process and conspiracy to commit abuse of process against Schron. Because we find that the Complaint fails to allege the facts necessary to support these claims, we do not consider the alternative grounds on which the bankruptcy court dismissed them.[16]

## B.    Dismissal with Prejudice

The bankruptcy court dismissed each of the claims against Schron with prejudice. Such dismissal is reviewed for abuse of discretion, and a court generally does not abuse its discretion where future amendments would be futile or unfairly prejudicial. We find no abuse of discretion.

---

be an improper purpose. But asserting a defense on THMI's behalf for the purpose of avoiding liability—which is all that is alleged here—cannot give rise to an abuse of process claim.

[16] The bankruptcy court also concluded that the abuse-of-process claims were due to be dismissed under Florida law's litigation privilege, which affords immunity to allegedly tortious acts occurring during the course of a legal proceeding so long as they have some relation to the legal proceeding. *See Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 608 (Fla. 1994). The only way the Estates could escape the application of the litigation privilege was by proving that the defense of THMI was a "sham"—*i.e.*, that the proceeding was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Atico Int'l USA, Inc. v. LUV N' Care, Ltd.*, No. 09-60397-CIV, 2009 WL 2589148, at *3 (S.D. Fla. Aug. 19, 2009). The bankruptcy court concluded that the Defendants' efforts to defend THMI were not a sham, as it was not unreasonable for them to believe they had authority to represent THMI based on the 2012 Settlement Agreement, even if the Agreement was later found to be unenforceable. We do not reach this issue.

43

The Estates' First Amended Complaint spanned nearly three-hundred pages and contained hundreds of repetitive paragraphs. Its narrative was convoluted and difficult to track. It did not comport with Rule 8's mandate to present a "short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain: . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). The bankruptcy court nonetheless granted the Estates an opportunity to amend, acknowledging the complexity of the underlying transaction.

Instead of clarifying the content of the initial pleading and remedying its deficiencies of form, the allegations in the Estates' Second Amended Complaint were no clearer or more precise than those contained in the First Amended Complaint. The Second Amended Complaint not only failed to remedy the inadequacies the bankruptcy court had identified, but it also repeated, by incorporation, numerous paragraphs contained in the First Amended Complaint and added another sixty pages of allegations, including four entirely new claims against several of the Defendants. In addition to the counts already contained in the initial complaint, the Second Amended Complaint newly alleged that various defendants committed abuse of process, conspiracy to commit abuse of process, and negligence, in addition to executing an avoidable post-petition transfer under a separate section of the Bankruptcy Code. And in support of the claims that the

Estates had already articulated, the Estates simply restated their initial factual allegations rather than adding new facts to illuminate Schron's role in the 2006 Transaction.

The Estates have given no indication that a third pleading would be any more fruitful than their second. If the Estates could have alleged viable claims against Schron, they already would have done so. We find no abuse of discretion in the court's decision not to grant the Estates a third bite at the apple and AFFIRM accordingly.

## CONCLUSION

We conclude that the bankruptcy court had jurisdiction to enjoin future claims arising from the 2006 Transaction and that it acted within the scope of its authority under the All Writs Act and the Anti-Injunction Act in issuing the Permanent Injunction. The Permanent Injunction was broad, but its breadth was justified in this case. We also find the various claims against Schron implausible as alleged in the Second Amended Complaint, even taking all the Estates' allegations as true. And given the Estates' inability or unwillingness to remedy the deficiencies in their pleadings, the bankruptcy court exercised proper discretion in dismissing the Second Amended Complaint with prejudice. We therefore AFFIRM the bankruptcy court's dismissal of claims against Schron with prejudice and its issuance of a permanent injunction with respect to claims against Schron.

45